# HEMP CROP AGREEMENT

This Hemp Crop Agreement ("Agreement") is made on June 1, 2019, by and between AG Green Farms LLC of 22 West Ontario Street, Suite 400, Chicago, IL 60654 (hereinafter referred to as " AGF") and Royalty Properties, LLC, with offices located at 18 E. Dundee Rd., Barrington, IL 60010 (hereinafter referred to as "RP") (and collectively the "Parties"), for the purpose of achieving the various aims and objectives relating to this Agreement (the "Project"). This Agreement will become legally binding upon full execution by the Parties.

WHEREAS AGF and RP desire to enter into this agreement in which AGF and RP will work together to complete the Project; and

WHEREAS AGF and RP are desirous of entering into a contract to plant and harvest hemp crop or hemp seed between them, setting out the working arrangements that each of the Parties agree are annually necessary to complete the Project.

NOW THEREFORE, in consideration of the foregoing recitals, each of which is hereby incorporated herein, the mutual premises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Purpose
The purpose of this Agreement is to be a binding five-year contract between AGF and RP with AGF having the option to renew for an additional five-year period upon six months prior written notice to RP.

Obligations of the Parties
The Parties acknowledge that no partnership relationship is created between them by this Agreement, but agree to work together as a joint venture in the true spirit of cooperation to ensure that there is a united visible and responsive leadership of the Project and to demonstrate financial, administrative and managerial commitment to the Project by means of the following. The Parties shall always remain independent of each other in their performance of their obligations under this Agreement. Neither Party shall have any authority to employ any individual as an employee or agent for or on behalf of the other Party to this Agreement for any purpose, and neither Party, nor any person performing any duties or engaging in any work at the request of such Party, shall be deemed to be an employee, partner or agent of the other Party.

Cooperation
The activities and services for the Project shall generally include, as further detailed herein, the following without limitation:

A. Services to be rendered by AGF include:

1. Provide seeds and other related materials for the hemp crop to be cultivated and harvested by RP. (each, a "Hemp Crop").



(Royalty Properties – AG Green Farms) Hemp Crop Agreement - - - - Page 1

2. Oversee compliance with material local, state and federal laws and regulations for hemp seed.

3. Appoint a representative/consultant ("AGF Consultant") to oversee, monitor and provide guidance for the Project, for which the Parties shall mutually agree each year upon the desired amount of that AGF Consultant's participation and the appropriate compensation to be paid therefor.

4. Provide internal guidance to maintain the appropriate quality of each Hemp Crop. ( the "Quality Guidelines").

5. Oversee compliance with all material federal, state and local laws and regulations relating to the cultivation and sale of the Hemp Crops.

B. Services to be rendered by RP include:

1. Overseeing compliance with material local, state and federal laws and regulations for the cultivation and sale of the Hemp Crops.

2. Cultivating organically-grown Hemp Crops in compliance with the Quality Guidelines.

3. Cultivating organic Hemp Crops to full maturity or to 0.2% to 0.3% THC limitations, whichever happens first or to seed as instructed by AGF.

4. Planting, cultivating, harvesting Hemp Crops in a responsible and compliant manner.

Resources

The Parties acknowledge and represent that they have final approval, financing, and all other resources commercially necessary to fulfill their individual obligations and financial contributions for the development of the Project during the term of this Agreement.

C.    AGF shall provide the following financial, material and labor resources in respect of the Project at AGF's sole expense:

1. AGF will provide sufficient number or weight of seeds to adequately plant 100 – 110 acres. As set forth below, any direct expenses paid for by either of the Parties, including but not limited to AGF's actual out-of-pocket direct costs expended for the seeds it provides and any fees paid to the AGF Consultant, shall be paid immediately after harvest, in the case of those paid in biomass (or sale of a Hemp Crop, for those paid in cash), and prior to any payments or distributions of a portion of a Hemp Crop being made to the Parties by deducting and reimbursing same from the gross crop revenue prior to calculating the amount (based on agreed percentage of gross profit or net remaining crop) to be shared by the Parties. By way of example, if a Hemp Crop is One Hundred (100) Pounds, and the AGF Consultant is owed ten percent (10%) of

the biomass and another service provider is owed One Thousand Dollars ($1,000) and there are no other expenses or capital expenditures associated with such Hemp Crop, remuneration from such Hemp Crop will be paid: i) first, the AGF Consultant will receive ten (10) pounds of the biomass, representing ten (10%) of such Hemp Crop harvest; ii) next, the remainder of the Hemp Crop is Sold for Nine Thousand Dollars ($9,000), and the other service provider is paid One Thousand Dollars ($1,000); and iii) finally, the Parties equally divide the remaining Eight Thousand Dollars ($8,000).

2. AGF will also appoint and pay a knowledgeable representative (who may be the AGF Consultant) to regularly inspect each Hemp Crop, in conformity with normal industry practices, and assist in overseeing the Project (subject to direction of the Parties, as provided herein), and to consult with RP to assist RP with cultivating quality organically-grown hemp, and to improve and maximize Hemp Crop yields.

3. For the 2019 season, in addition to his daily visit rate and travel expenses (which will be paid advanced by AGF and reimbursed to AGF as any other third-party reimbursable expense as described in paragraph A.1. immediately above), the AGF Consultant will be paid a consulting fee in kind of 10% of the 2019 Crop (i.e. 10% the actual biomass and/or Seed harvested in 2019). This shall also be treated as an expense of the Project and shall be paid prior to any other payments to the Parties.

4. All other expenses paid by the Parties to third parties for the 2019 Hemp Crop will be reimbursed prior to any other payments being made to the Parties.

5. The Parties will promptly complete their final inspection and take possession of their share of the Hemp Crop or seed at field when harvested and weighed, after processing the entire Hemp Crop to obtain seeds or hemp flower and biomass or as otherwise agreed to in writing.

6. Process each entire Hemp Crop at harvest to obtain seeds or hemp flower and biomass.

D. RP shall provide the following labor and equipment resources in respect of the Project:

1. RP will provide the following Hemp Crop cultivation services as reasonably needed: land preparation, planting, fertilizing, watering, insect and weed control, inspection and removal of any male plants as directed by AGF Consultant, if crop is chosen to be for CBD, and harvesting. For providing same, RP may utilize third party services and equipment on a share-crop basis.

2. Expenses of production. RP shall be responsible, or provide, each of the following items as reasonably needed for the Project. RP has already made arrangements to use a third party which will cover these expenses for RP on a crop share basis, subject to AGF's approval:

    a. Certified Organic Insecticide (if required)

      b. Frost Control (if required)
      c. Certified Organic Fungicide (if required)
      d. Certified Organic Herbicide (if required)
      e. Plutophthora Root Rot amendment. (if required)
      f. Certified Organic Pest Infestation (if required)
      g. Security Cameras and 24-hour Personnel
      h. Harvesting of the Crop in conjunction with RP

3. RP will obtain, at its own expense, any licensing and Crop testing required for hemp cultivation and harvesting.

4. RP will comply with material local, state and federal laws and regulations regarding hemp cultivation.

5. RP will cultivate a Crop that is suitable to AGF or its associates, in compliance with the Quality Guidelines.

6. RP may, but is not required to, obtain liability and/or Crop insurance at its own expense.

E. THE CROP

Crop to consist of harvested organically-grown hemp plant material (seeds, flowers, and/or biomass)

Acreage of 2019 Fields: 100 – 120 organic acres

Additional Acreage: Any additional farmland in Illinois or Wisconsin farmed by or on behalf of RP or its affiliates for the production of Hemp during the term of this Agreement.

Estimated Quantity of Hemp Crop: 200,000 plants

Estimated Date of Crop Harvest: September

Estimated Date of Product Availability: At harvest

Projected Crop Valuation: RP Estimates that RP's share of the initial Hemp Crop should be approximately $10,000,000, but actual valuation will depend on yield, market conditions and other factors beyond the Parties' control. RP agrees and acknowledges, that AGF and its affiliates make no representations or warranties as to the market value of the initial or any other Hemp Crop, and shall have no liability to RP or any other person due to the value of the initial or any other Hemp Crop being less than RP's or any other person's estimates of the value thereof.

F. **PRODUCT QUALITY GUIDELINES**

1. RP shall do all things reasonably necessary to ensure that each Hemp Crop complies with the specifications contained in this Agreement. Detailed explanation of these Specifications may be obtained from AGF upon request. RP at AGF's instruction and direction will sow the seed or seedlings in a proper and careful manner in properly tilled or managed soil as agreed with AGF and will harvest the crop in good condition and in accordance with good harvesting practices. All machinery and equipment used at the time of planting and harvesting should be clean and free of contaminants, other grain and noxious seeds. RP shall exercise due care to ensure risks in mixing any seed in planters is avoided and growing and harvesting practices are managed to avoid any cross-contamination of the Hemp Crop.

2. It is RP's responsibility to ensure crop supplied conforms to the requirements of the 2018 Farm Bill (https://www.congress.gov/bill/115th-congress/senate-bill/2667/text ) and rules and regulations promulgated thereunder and other relevant laws and regulations.

3. Only approved organically registered products may be used on Hemp Crops. RP and it's applicators and other agents and suppliers must comply with all material relevant legislation when storing, transporting and applying chemicals or other materials.

4. RP shall provide AGF with a third-party (the "RP Expert") certificate as to the weight of the Hemp Crop and its compliance with the grade specifications agreed upon by the Parties. AGF has the right to verify weight and grade specifications by the RP Expert. The RP Expert certificate provided by RP and verified by AGF shall be final and conclusive as to the weight , moisture content and grade of the Crop except as otherwise provided herein. If AGF disagrees with the RP Expert certification, AGF may, at its own expense engage a third-party (the "AGF Expert") to verify the weight of the Hemp Crop and its compliance with the grade specifications agreed upon by the Parties. If the RP Expert and the AGF Expert disagree, they shall jointly appoint an additional third-party (the "Expert") to certify the weight of the Hemp Crop and its compliance with the grade specifications agreed upon by the Parties. The certificate provided by the Expert shall be final and conclusive as to the weight, moisture content and grade of the Crop on the Parties. Any and all expenses associated with the engagement of the Expert shall be shared equally by RP and AGF.

5. AGF will instruct RP whether the Hemp Crop variety is the subject of a grant of plant variety rights under the Plant Variety Rights Act 1987 and/or is subject to restrictions laid down by the holder of that grant. RP hereby confirms that it is familiar with the provisions of that Act and agrees to comply with all material provisions thereof.

6. AGF will disclose to RP any current COAs (Certificate of Analysis) and ratio tests, if conducted on site or by a genetics company. This also includes seed/clone certification from genetics companies. If hemp flower and biomass is selected, and feminized seed/clones are not used, a mitigation plan must be submitted by AGF to RP describing how to eliminate the males (X, Y) from the crop. Cross pollination must be avoided at all commercially reasonable costs, and male plant mitigation plan must cover the possibility of cross pollination. RP and AGF will both use commercially reasonable best efforts to identify and

cull any male plants in the crop, unless otherwise agreed by the Parties.

7. If a Hemp Crop is chosen to be CBD flower and biomass, such Hemp Crop will be required to be harvested if THC COA chemical testing shows 0.2% - 0.3% THC potency, regardless of calendar date and/or maturity of crop. Sample testing is required weekly after 4 weeks maturity. If Crop is to be seed, AGF Consultant will make recommendations to RP as to proper pollination and harvesting, and RP shall use sound judgment to evaluate and potentially implement AGF Consultant's recommendations in order to maximize success of the Project.

8. Recognizing that demand for seeds, and hence the market price, is greatest just prior to planting season, the Parties intend to sell the total Crop minus the 10% distributed in kind to the AGF Consultant and minus any other share crop distributions for Project purposes at the appropriate time(s) so as to maximize the gross revenue to be derived therefrom (the "Gross Crop Revenue"). Each Party shall be entitled to reimbursement (pari passu based on actual out-of-pocket expenditures) of their respective prior direct expenditures on materials and labor (including amounts paid or distributed toward share crop amounts) for cultivating the Hemp Crop, which amounts shall be deducted from the gross revenue from such Hemp Crop to be shared between the Parties. AGF and RP agree that, on an ongoing basis, each year's gross profit (or, if distributed between them as actual flowers and biomass or seed, each Party's respective portion of such Hemp Crop) is to be shared equally between them on a 50/50 basis after reimbursement to AGF of the expenses relating to the AGF Consultant and other expenses as provided in this Agreement, including, but not limited to the AGF Consultant's daily visit fees and travel expenses and other expenses as described herein. Although the Parties intend to sell the remaining portion of each such Hemp Crop after payment of all expenses, each year at the most advantageous time so as to maximize the Gross Crop Revenue, for the first 2019 Crop only, RP shall be entitled to sell up to its entire 50% share of such Hemp Crop no later than November 15, 2019 in order to potentially receive RP's 2019 target price of $10,000,000 therefor. Each year, the Parties shall agree upon whether Hemp Crop is to be harvested as flowers and biomass for CBD, or if the Hemp Crop is to be harvested for seed. (If no such agreement is timely reached, in writing signed by both Parties, it shall be conclusively presumed that the entire Hemp Crop shall be harvested as seed). The 2019 Crop is to be grown for seed.

## G. AGREEMENT CONDITIONS

1. Liens Against the Crop. The Parties and the AGF Consultant agree not to allow any liens to be placed upon or against the Crop, except The AGF Consultant shall have a first priority lien against 10% of the 2019 Crop until distribution in kind of said 10% of the Crop to AGF Consultant.

2. Should RP be unable for any reason to plant the seeds AGF supplies by the designated planting date, as mutually determined, AGF shall be advised immediately. If that occurs, AGF may cancel this contract without penalty or may change the hybrid to be planted without penalty.

3. RP must take all commercially reasonable steps to ensure that the fields in which the crop is to be planted are free from any and all noxious plants as defined by law, regulation or custom and otherwise comply with all relevant laws and regulations.

4. RP will maintain a comprehensive and accurate report, in a form acceptable to AGF, of the sowing, cultivation and spray management history of each Hemp Crop (each, a "Spray Diary"). This record will be made available to AGF prior to the commencement of the Hemp Crop harvest and upon request at any other time. If the Spray Diary is complete and acceptable to the relevant state department of agriculture and the Ecocert list of acceptable organic amendments, AGF agrees to accept the Spray Diary.

5. RP warrants that the RP has not entered into, and will not enter into, any mortgage, lien, charge or undertaking in respect of the Hemp Crop that would preclude or interfere with AGF's entitlement to delivery of the Hemp Crop hereunder or that would hinder RP from performing its duties described in this Agreement.

6. RP shall notify AGF and the AGF Consultant of the intended harvest date. RP shall, on the notified date, harvest the Hemp Crop and AGF and the AGF Consultant shall take delivery and possession of their respective shares at the field reasonably promptly upon harvest. The crop must be whole, sound, free of objectionable color, disease, fungal attack, decay, insect infestation, vermin excrement, foreign matter or any other blemish or odor rendering it unsuitable. The Hemp Crop will be weighed at the field in a hopper with scale in a mutually acceptable manner.

7. AGF shall inspect each Hemp Crop at regular intervals during the growing and harvesting period. AGF has an obligation to notify RP of any material problem with the Hemp Crop identified during an inspection. Delivery of their shares of the Hemp Crop and acceptance by AGF and the AGF Consultant shall be deemed not to have taken place until AGF has ascertained that the Hemp Crop meets the specifications provided for by this Agreement, including, but not limited to those requirements set forth in Paragraph F.4. above , and/or at law.  At time of delivery, AGF shall reasonably promptly inspect such Hemp Crop on location and must accept delivery of its share of such Hemp Crop that meets all said specifications, and has been properly certified, which acceptance shall not be unreasonably withheld.

8. RP shall not sell any portion of any Hemp Crop to any third-party without first giving AGF a five-business days right of first refusal to purchase RP's portion of such Hemp Crop at the same price as any bona fide offer RP receives.

9. Subject to the Parties and the AGF Consultant first participating in the informal dispute resolution procedure set forth below, any unresolved dispute regarding or relating to this contract shall be settled by arbitration of a single arbitrator (if agreed) or failing agreement by the arbitration of Arbitrators in accordance with the Arbitration Act 1996 and amendments thereto.

## H. AGF REPRESENTATIONS AND WARRANTIES

AGF represents and warrants to RP:

1. AGF is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and has full right and authority to execute this Agreement and to perform its obligations hereunder. All required corporate action with respect to AGF has been taken to approve this Agreement. This Agreement constitutes the valid and binding obligation of AGF, enforceable in accordance with its terms. The execution and delivery of this Agreement and the performance by AGF of this Agreement in accordance with its terms will not require the approval or consent of, or notice to or filings with any federal, state, county, local or other governmental or regulatory body.

2. The execution, delivery and performance by AGF of this Agreement does not and will not (i) violate any provisions of the Articles of Formation or limited liability company agreement of AGF; or (ii) result in any violation by AGF of any law, rule or regulation, or any judgment, injunction, order, decree, permit or license of any judicial or administrative authority or arbitrator applicable to AGF.

## I. RP REPRESENTATIONS AND WARRANTIES

RP represents and warrants to AGF:

1. RP is a limited liability company duly organized, validly existing and in good standing under the laws of Florida and has full right and authority to execute this Agreement and to perform its obligations hereunder. All required corporate action with respect to RP has been taken to approve this Agreement. This Agreement constitutes the valid and binding obligation of RP, enforceable in accordance with its terms. The execution and delivery of this Agreement and the performance by RP of this Agreement in accordance with its terms, except in relation to the bankruptcy proceeding (the "Proceeding") described on Exhibit I.1. attached hereto and incorporated herein, will not require the approval or consent of, or notice to or filings with any federal, state, county, local or other governmental or regulatory body.

2. The execution, delivery and performance by RP of this Agreement does not and will not (i) violate any provisions of the Articles of Formation or limited liability agreement of RP; or (ii) result in any violation by RP of any law, rule or regulation, or any judgment, injunction, order, decree, permit or license of any judicial or administrative authority or arbitrator applicable to RP.

## J. MISCELLANEOUS

Communication Strategy
Where it does not breach any confidentiality protocols, a spirit of open and transparent communication should be adhered to.

Informal Dispute Resolution Procedure

                            1-3    Page 9 of 19

In the event of a dispute between the Parties and/or AGF Consultant in the interpretation of this contract or relating to this Project, a dispute resolution group will convene consisting of the Chief Executives of each affected Party and/or AGF Consultant together with one other independent person who is mutually appointed by the Chief Executives. The appointed independent member of the dispute resolution group may receive for consideration any information the Parties and AGF Consultant (if applicable) think fit concerning the dispute. In the event the dispute resolution group is unable to make a compromise and reach a final decision, either Party or the AGF Consultant may then seek resolution by arbitration as set forth herein.

Term

The arrangements made by the Parties by this Agreement shall remain in place from Effective Date June 1, 2019 and continuing for the five additional calendar years thereafter (through December 31, 2023). The term can be extended only by agreement of all of the Parties. Notwithstanding anything to the contrary contained in this Agreement, AGF may, by giving written notice to RP not less than sixty (60) days prior to the end of the term of this Agreement, extend this Agreement for one (1) additional five (5) year term.

Notwithstanding the foregoing, if either Party materially breaches this Agreement, the non-breaching Party shall have the right to terminate this Agreement by written notice to the breaching Party specifying the breach, if such breach is not cured within sixty (60) days after written notice is given by the non-breaching Party to the breaching Party specifying the breach; provided, however, that in the event of a good faith dispute with respect to the existence of a material breach, this Agreement shall not be terminated unless it is finally determined pursuant to the terms of this Agreement such material breach has occurred, and the breaching party fails to cure such breach within sixty (60) days after such determination.

Each Party shall have the right to terminate this Agreement upon delivery of written notice to the other Party in the event that (i) such other Party files in any court or agency pursuant to any statute or regulation of any jurisdiction a petition in bankruptcy or insolvency or for reorganization or similar arrangement, other than in respect of the Proceeding, for the benefit of creditors or for the appointment of a receiver or trustee of such other Party or its assets, (ii) such other Party is served with an involuntary petition against it in any insolvency proceeding and such involuntary petition has not been stayed or dismissed within ninety (90) days of its filing, or (iii) such other Party makes an assignment of substantially all of its assets for the benefit of its creditors.

Effects of Termination.

Expiration or termination of this Agreement for any reason shall not release either Party of any obligation or liability which, at the time of such expiration or termination, has already accrued to such Party or which is attributable to a period prior to such expiration or termination.

Notice

Any notice or communication required or permitted under this Agreement shall be sufficiently given if delivered in person or by certified mail, return receipt requested, to the address set forth in the opening paragraph or to such other address as one party may have furnished to the other in writing, so long as simultaneously also provided by electronic (email) transmission.

Indemnification by AGF.
AGF shall indemnify, defend and hold harmless RP, its directors, officers, managers, employees, owners, agents, successors and assigns from and against any liabilities, expenses or costs ( including reasonable attorneys' fees and court costs) arising out of any claim, complaint, suit, proceeding or cause of action against any of them by a Third Party resulting from: (a) the grossly negligent or intentionally wrongful acts or omissions of AGF, its affiliates and subcontractors or (b) any breach by AGF of its representations and warranties under this Agreement; in each case, subject to the requirements and limitations set forth in in the Indemnification Procedures and Limitation of Liability Sections below. Notwithstanding the foregoing, AGF shall have no obligations under this Section for any liabilities, expenses or costs arising out of or relating to claims to the extent covered under the Indemnification provided by RP below.

Indemnification by RP.
RP shall indemnify, defend and hold harmless AGF, its directors, officers, managers, employees, owners, agents, successors and assigns from and against any liabilities, expenses or costs ( including reasonable attorneys' fees and court costs) arising out of any claim, complaint, suit, proceeding or cause of action against any of them by a Third Party resulting from: (a) the grossly negligent or intentionally wrongful acts or omissions of RP, its affiliates and subcontractors or (b ) any breach by RP of its representations and warranties under this Agreement; in each case, subject to the requirements and limitations set forth in in the Indemnification Procedures and Limitation of Liability Sections below. Notwithstanding the foregoing, RP shall have no obligations under this Section for any liabilities, expenses or costs arising out of or relating to claims to the extent covered under the Indemnification provided by AGF above.

Indemnification Procedure.
Any Party seeking indemnification under this Agreement (the "Indemnitee") shall: (a) promptly notify the indemnifying Party (the "Indemnitor") of such claim; (b) provide the Indemnitor sole control over the defense or settlement thereof; and (c) at the Indemnitor's request and expense, provide full information and reasonable assistance to Indemnitor with respect to such claims. Without limiting the foregoing, with respect to claims brought under either of the Indemnification provisions above the Indemnitee, at its own expense, shall have the right to participate with counsel of its own choosing in the defense or settlement of any such claim. The indemnification under this Agreement shall not apply to amounts paid in settlement of any claim if such settlement is effected without the consent of the Indemnitor.

Waiver.
Any waiver of the terms and conditions hereof must be explicitly in writing and executed by a duly authorized officer of the Party waiving compliance. The waiver by either of the Parties of any breach of any provision hereof by the other shall not be construed to be a waiver of any succeeding breach of such provision or a waiver of the provision itself. The delay or failure of any Party at any time to require performance of any provision of this Agreement shall in no manner affect such Party's rights at a later time to enforce the same.

Insurance.

Each Party will procure and maintain, at its own expense, insurance, with a financially sound and reputable insurer, reasonably sufficient to cover such Party's activities and its obligations under this Agreement with minimum coverage amounts customary for the activities of such Party hereunder in the jurisdiction(s) where such activities are performed. Each Party will furnish at the request of the other Party a certificate(s) reflecting relevant insurance coverage and limits. Each Party will name the other as an additional insured on the policies for the coverage required herein.

DISCLAIMERS.
EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES (EXPRESS, IMPLIED, STATUTORY OR OTHERWISE) WITH RESPECT TO THE SUBJECT MATTER HEREOF AND EACH PARTY EXPRESSLY DISCLAIMS ANY SUCH ADDITIONAL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY OR NONINFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS.

LIMITATION OF LIABILITY.
NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES INCLUDING, BUT NOT LIMITED TO LOST PROFITS ARISING FROM OR RELATING TO THIS AGREEMENT, REGARDLESS OF ANY NOTICE OF THE POSSIBILITY OF SUCH DAMAGES.

Governing Law
This Agreement shall be construed and enforced in accordance with the laws of the State of Illinois, to the appropriate courts of which, state and Federal, located within Cook County, the Parties hereby submit to jurisdiction and venue as the most convenient forum. The prevailing party in any formal arbitration or court proceeding to enforce or interpret this Agreements may be entitled to recover all reasonable attorney fees, costs and related expenses if so determined by the arbitrator or court.

Assignment
Except as otherwise set forth herein regarding possible share-cropping services, neither party may assign or transfer the responsibilities or agreement made herein without the prior written consent of the non-assigning party, which approval shall not be unreasonably withheld.

Amendment
This Agreement may only be amended or supplemented in writing, if the writing is signed by the parties affected by the change(s).

Severability
If any provision of this Agreement is found to be invalid or unenforceable for any reason, the remaining provisions will continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision will be deemed to be written, construed, and enforced as so limited.

Prior Agreement Superseded

This Agreement constitutes the entire Agreement between the parties relating to this subject matter and supersedes all prior or simultaneous representations, discussions, negotiations, and Agreements, whether written or oral.

Understanding

It is mutually agreed upon and understood by between, and among the Parties to this Agreement that:

a. Both Parties will work together in a coordinated fashion for the fulfillment of the Project.
b. In no way does this agreement restrict involved parties from participating in similar agreements with other public or private agencies, organizations, and individuals.
c. To the extent possible, each party will participate in the development of the Project.
d. Any endeavor involving reimbursement or contribution of funds between the parties to this Agreement will be handled in accordance with the terms of this Agreement and all applicable laws, regulations, and procedures.
e. This Agreement is not intended to and does not create any partnership, right, benefit, or trust responsibility.
f. This Agreement will be effective upon signature by both Parties and the AGF Consultant, subject only to the approval of any applicable governing authority(ies) or court(s).

The following parties support the goals and objectives of the Hemp Cultivation Agreement Project:

SIGNATORIES

This Agreement shall be signed on behalf of AG Green Farms LLC by Bobby Whalen, and by Meryl Squires-Cannon on behalf of Royalty Properties, LLC. This Agreement shall be effective as of the date first written above.

AG Green Farms LLC

_____ 6-4-19
By: Bobby Whalen, its Managing Member

Royalty Properties, LLC

_____ 6-4-19
By: Meryl Squires-Cannon, its Managing Member

## WALTER B FUQUA

505-720-4040
Walterfuqua@gmail.com

PO Box 3505
Corrales, New Mexico
87048

Profile

Self-employed and involved in agricultural hemp cultivation in southeast Asia for over 40 years, Mr. Fuqua has vast knowledge of operational leadership skills and broad ranging skills from planting, cultivating and harvesting hemp, mining minerals, and mining reclamation techniques spanning specific skill sets that include construction, soils management, agricultural stable environmental assessment as well as biological habitat stabilization and remediation. He has also created stable habitats for controlled environments to assist the introduction of stabilized plant colonies in altered terra- scapes which includes revitalization of sterile soils and contaminated soils.

Mr. Fuqua's companies have had clients on all continents which evaluated and remediated mining zones to repair damaged soils with organic techniques that rebalanced native soils to achieve an environmentally sustainable state allowing for rapid flora and fauna recovery.

He has studied the effects of various states of mineral, water, and organic structures to create optimal absorption for agricultural regeneration and long term growth environments.

He has also designed and built self-contained environmental habitats such as Aquaponics systems designed to reestablish eco- systems in barren lands as well as built indoor cultivation habitats for agricultural purposes.

Mr. Fuqua has vast experience in utilization of naturally sourced minerals, nutrients and feeding systems including raw material conversion, microbes, aerobic and anerobic bacterias, organic nutrients and live fungi horticulture along with other plant food release mechanisms used in all parts of the world, bringing those resources together to improve cultivation, yield, and general good farming practices for organically grown crops.

Experience

### Rocky Mountain Minerals, LLC. 2016-Present

Owner and operator of Rocky Mountain Minerals, an organic fertilizer and nutrient company. Mr. Fuqua is an expert in organic farming techniques that emphasize organically sourced materials necessary to blend the finest materials sourced from the entire planet, into specialized fertilizers for high value crops including cannabis, mushrooms, medicinal herbs, fungi, and select extractable spices.

### Key Molecules, LLC - 2016 - Present

Key Molecules, LLC was formed to manufacture pharmaceutical grade CBD products aimed at the health care and cosmetic industries. Our team of Ph.D

scientists develop skin care and ingestible products made from hemp and CBD related ingredients. Key Molecules manufactures consumer products for general consumption and industry specific uses such as facial care, tattoo, and other beauty products.

### High Desert Aquaponics — November 2017-Present

Founder of High Desert Aquaponics. This company was formed to create a laboratory and research environment for Aquaponics farming techniques development in arid and high elevation environments.

### Mineral Management 1,2 — 2006-Present

CEO of Mineral Management 1 and 2. Mr. Fuqua sources raw minerals from mines and mining vicinities for agricultural purposes. These raw minerals are processed into usable forms of nutrients for agricultural purposes.

### Consultant- 1998 - Present

Expert consultant for agricultural ergonomic farming techniques, land utilization techniques. Mr. Fuqua collaborates with Ph.D scientists at the global level to bring best farm practices to small disadvantaged farmers. This business has allowed observation of farm and agricultural practices across the globe and to integrate those techniques in small farm operations to maximize both crop yield and conservation of resources.

### International Business Consultants 1977-1997

As the founder and principal operator, Mr. Fuqua developed mining relations and delivered high quality minerals directly to growers and large farming operations throughout Southeast Asia. We concentrated our product lines along the organic pathways and discovered ways to chelate minerals for immediate bioavailability.

Upon returning to the USA, Mr. Fuqua set out to build a source of minerals similar to the mineral sets used in agriculture in SE Asia

### Education

University of New Mexico
Central New Mexico University - Chemistry
University of Puerto Rico- Agriculture

### Skills

A lifelong self-employed corporate level entrepreneur, Mr. Fuqua has substantial experience in start up operations and extensive management experience in emerging market development opportunities. His global level experiences have allowed him to source materials, techniques, and best practices from many types of conditions and environments. Decades long observation of means and methodology from every corner of the globe has given him a unique understanding of global challenges as well as solutions to agricultural aspects of farming

techniques and learned practices by both small and large scale farming operations, including without limitation the plating, cultivating and harvesting of cannabis plants for CBD oil and seeds.

References

Dr. John Remo, Ph.D physics Harvard University

Dr, Monica Alfaro Ph.D. Micro biology, University of Puerto Rico

Dr. Laura Lopez Ph.D. Analytical Chemistry, University of Puerto Rico

Dr. Raul Hinojosa Ph.D, center for Latin American studies, UCLA

Ben Romero, CEO Future Farms, LLC

D Roy Serventi, Mirimar Holdings, LLC

## Hemp Farm Crop Share Agreement 2019

This Hemp Crop Share Agreement is made between Royalty Properties, LLC ("RP") and Little Tykes Farm ("LTF") (collectively the "Parties") on this effective date May 1, 2019 for the share of any hemp crop harvested in 2019 from the following described Property:

Property Location: Horizon Farm 311 Algonquin Rd., Barrington Hills, Illinois 60010
Legal Description: 100+- acres Hemp Crop in 2019.

1. The parties agree that LTF will receive 10% share of RP's 2019 hemp crop proceeds, capped at $1,000,000, contingent on successful harvest and sale of hemp crop.

2. The term shall be as follows:

   Fixed term beginning on May 1, 2019 and ending on December 31, 2019 for a total period of eight months.

3. LTF agrees to prepare fields, plant fields (with seeds provided by RP), fertilize fields, and harvest fields and practice sustainable crop management methods as directed by RP and or prescribed by the FSA Farm Service Agency.

4. LTF understands and acknowledges that success of the hemp crop is subject to multiple time-sensitive requirements, and for that reason LTF shall give its performance duties and obligations under this Agreement absolute top priority over and above any and all other activities or projects or share crops that LTV may also participate in or pursue at other locations, even if it means a reduction in or loss of income from LTV's other such activities.

5. LTF may make improvements to fences, water systems and other items on the Property, provided that prior consent has been given by RP. If such consent is given, all such improvements shall be made at the expense of LTF and shall become the property of RP.

6. RP shall have the unlimited right to enter the Property to inspect the Property, and will work in conjunction with LTF's agricultural activities on the Property.

7. LTF may not subcontract or assign this Agreement to any other persons without the prior written consent of RP.

8. It is agreed that this hemp crop share agreement shall not create a partnership relationship


EXHIBIT 2

between the Parties, and that LTF is an independent contractor hereunder with its own liability and workers comp insurance policies.

9. Additional terms and conditions: LTF will cooperate with RP to farm a successful hemp crop.

**Agreed to by the Parties in Barrington Hills, Cook County, Illinois:**

**Royalty Properties, LLC:**

Signature: _____ Title: Managing Member

Address: 18 E. Dundee Rd. Barrington, IL 60010

Effective Date: May 1, 2019

**Little Tykes Farm:**

Signature: _____ Title: Owner

Address: 2608 Route 47, Woodstock, IL 60098

Effective Date: May 1, 2019

# Royalty Farms 2019 Hemp Crop Share Agreement

This Hemp Crop Share Agreement is made between Royalty Properties, LLC ("RP") and Royalty Farms, LLC ("RF") (collectively the "Parties") on this effective date June 1, 2019 for the share of any hemp crop harvested in 2019 from the following Property:

Property Location: Horizon Farm 311 Algonquin Rd., Barrington Hills, Illinois 60010
Estimated Planting: 100+- acres Hemp Crop in 2019

1. The term of this Agreement shall be as follows:

    Fixed term beginning on June 1, 2019 and ending on December 31, 2019 for a total period of seven months.

2. RF will receive a 2% share of the 2019 hemp crop proceeds, capped at $250,000, contingent on successful harvest and sale of hemp crop on the Property under that 2019 Hemp Crop Agreement between AG Green Farms LLC and RP.

3. **RF shall provide,** at its own expense, **all required labor and use of its equipment** (to the extent not provided by Little Tykes Farm under its separate share crop agreement with RP), to assist with: preparing fields, planting fields, fertilizing fields, weeding fields, pollinating hemp plants (if requested), treat with insecticide (if requested), and harvest hemp plants, and to practice sustainable crop management methods, all as directed by RP.

4. **RF shall also provide,** at its own expense, **each of the following expenses**, as needed for the hemp crop and as requested by RP:

    a. Certified Organic Insecticide (if required)
    b. Frost Control (if required)
    c. Certified Organic Fungicide (if required)
    d. Certified Organic Herbicide (if required)
    e. Plutophthora Root Rot amendment. (if required)
    f. Certified Organic Pest Infestation (if required)
    g. Security Cameras and 24-hour Personnel
    h. Harvesting of the Crop in conjunction with Little Tykes Farm

5. RF understands and acknowledges that success of the hemp crop is subject to multiple time-sensitive requirements, and for that reason will work to accommodate those timelines.

6. RP shall have the unlimited right to enter the Property to inspect the Property, and to work in conjunction with RF's agricultural activities on the Property.


EXHIBIT 3

7. RF may not subcontract or assign this Agreement to any other persons without the prior written consent of RP.

8. It is agreed that this hemp crop share agreement shall not create a partnership relationship between the Parties, and that RF is an independent contractor hereunder with its own liability and workers comp insurance policies.

9. Additional terms and conditions: RF will cooperate with RP to farm a successful hemp crop.

**AGREED TO on June 1, 2019 in Barrington Hills, Cook County, Illinois:**

**Royalty Properties, LLC:**

Signature: _____
Meryl Squires-Cannon, Managing Member

Signature: _____
Richard Kirk Cannon, Member

Address:   18 E. Dundee Rd., Building 3, Suite 204
           Barrington, IL 60010


**Royalty Farms, LLC:**

Signature: _____
Meryl Squires-Cannon, Managing Member

Address:   311 Algonquin Road
           Barrington Hills, IL 60010