# EXHIBIT 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT - CHANCERY DIVISION**

| | | |
|---|---|---|
| THE FOREST PRESERVE DISTRICT OF<br>COOK COUNTY, ILLINOIS, | )<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | No. 18 L 315<br>(formerly No. 09-CH-18291) |
| v. | )<br>) | |
| ROYALTY PROPERTIES, LLC; CANNON<br>SQUIRES PROPERTIES, LLC; RICHARD<br>KIRK CANNON; MERYL SQUIRES<br>CANNON; ROYALTY FARMS, LLC,<br>MCGINLEY PARTNERS, LLC; UNKNOWN<br>OWNERS AND NON-RECORD<br>CLAIMANTS, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Property Address:<br><br>311 Algonquin Road, Barrington<br>Hills, Illinois 60010 |
| Defendants. | )<br>)<br>)<br>)<br>) | |

## JUDGMENT FOR FORECLOSURE AND SALE

This cause coming to be heard on a trial of the claims, defenses, and counterclaim, and this action having been commenced by the filing of a Verified Complaint for Foreclosure and Other Relief, and including certain substituted or added Defendants; ROYALTY PROPERTIES, LLC; CANNON SQUIRES PROPERTIES, LLC; RICHARD KIRK CANNON; MERYL SQUIRES CANNON; ROYALTY FARMS, LLC; and MCGINLEY PARTNERS, LLC; UNKNOWN OWNERS AND NON-RECORD CLAIMANTS (collectively, "Defendants"); and

That the persons designated as UNKNOWN OWNERS and NON-RECORD CLAIMANTS include other persons who are interested in this action and who have or claim some right, title, interest or lien in, to or upon the real estate, or some part thereof in this Verified Complaint ("Complaint"); and in addition other persons who are interested in this action and who have or claim some right, title, interest or lien in, to or upon the real estate, or some part thereof in this Complaint; that the name of each of such other persons interested in this action is unknown to the Plaintiff, and upon diligent inquiry cannot be ascertained, and all such persons are, therefore, made parties defendant to this action by the name and description of UNKNOWN OWNERS and NON-RECORD CLAIMANTS; and

The Court having examined the files and records in this cause and having examined the evidence and being fully advised in the premises finds that Defendants ROYALTY PROPERTIES, LLC; CANNON SQUIRES PROPERTIES, LLC; RICHARD KIRK CANNON; MERYL SQUIRES CANNON; ROYALTY PROPERTIES, LLC and MCGINLEY PARTNERS, LLC; and UNKNOWN OWNERS AND NON-RECORD CLAIMANTS in this cause have been duly and properly brought before the court, either through service of Summons or publication, all in manner provided by law; that due and proper notice has been given to each of the Defendants during the progress of this cause, as required by law and that this Court now has jurisdiction over all of the parties to this cause and the subject matter hereof; and

This cause coming to be heard on a trial on the merits of the claims, defenses, and counterclaims heard from May 20, through May 24, 2019, and it further appearing to the Court that due notice of the presentation of this Judgment has been given to all parties entitled thereto, and the Court being fully advised in the premises, does find from the files, records and competent evidence herein, as follows:

1.     That the Mortgage, Note, and Guaranty, respectively, were admitted into evidence as Plaintiff's Exhibits 40, 41 and 43.

2.     That Plaintiff has proven a default under the terms of the Note, Mortgage, and Guaranty, and, that by virtue of the Mortgage recorded in the Office of the Recorder of Deeds of Cook County, Illinois, as Document No. 0636231110 and the evidence of indebtedness secured there is due to Plaintiff, and it has a valid and subsisting lien on, the property described hereafter as:

PARCEL 1:

THAT PART OF SECTIONS 9 AND 16, TOWNSHIP 42 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF LOT 4 IN THE RESUBDIVISION OF LOTS 3 THROUGH 9 IN GOOSE LAKE SUBDIVISION, RECORDED DECEMBER 26, 1984 AS DOCUMENT NUMBER 27383221; THENCE SOUTH 0 DEGREES 33 MINUTES 14 SECONDS WEST, 929.62 FEET, ALONG THE WEST LINE OF SAID LOT 4 TO THE NORTH LINE OF THE SOUTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 9 AFORESAID; THENCE NORTH 89 DEGREES 51 MINUTES 47 SECONDS WEST, 614.90 FEET, ALONG SAID NORTH LINE TO A LINE 102.40 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF THE NORTHEAST QUARTER OF SECTION 9 AFORESAID; THENCE SOUTH 0 DEGREES 24 MINUTES 28 SECONDS WEST, 911.36 FEET, ALONG SAID PARALLEL LINE TO A POINT 255.97 FEET SOUTH OF THE SOUTH LINE OF THE NORTHEAST QUARTER OF SECTION 9 AFORESAID; THENCE NORTH 87 DEGREES 50 MINUTES 42 SECONDS WEST, 227.58 FEET, ALONG A LINE WHICH CROSSES THE NORTH-SOUTH CENTERLINE OF SECTION 9 AFORESAID AT A POINT 252.48 FEET, AS MEASURED ALONG SAID NORTH-SOUTH CENTERLINE, SOUTH OF THE NORTH LINE OF THE SOUTH HALF OF SECTION 9 AFORESAID; THENCE SOUTH 62 DEGREES 22 MINUTES 18 SECONDS WEST, 106.10 FEET, ALONG A LINE FORMING AN ANGLE WITH THE LAST DESCRIBED COURSE OF 150

DEGREES 13 MINUTES, AS MEASURED FROM EAST TO SOUTHWEST; THENCE SOUTH 30 DEGREES 18 MINUTES 48 SECONDS WEST, 318 97 FEET, ALONG A LINE FORMING AN ANGLE WITH THE LAST DESCRIBED COURSE OF 147 DEGREES 56 MINUTES 30 SECONDS, AS MEASURED FROM EAST TO SOUTHWEST; THENCE SOUTH 76 DEGREES 05 MINUTES 28 SECONDS WEST, 47.12 FEET, ALONG A LINE FORMING AN ANGLE WITH THE LAST DESCRIBED COURSE OF 134 DEGREES 13 MINUTES 20 SECONDS, AS MEASURED FROM NORTHEAST TO SOUTHWEST; THENCE NORTH 57 DEGREES 49 MINUTES 32 SECONDS WEST, 313.95 FEET, ALONG A LINE FORMING AN ANGLE WITH THE LAST DESCRIBED COURSE OF 133 DEGREES 55 MINUTES, AS MEASURED FROM NORTHEAST TO NORTHWEST, TO THE CENTERLINE OF SUTTON ROAD; THENCE SOUTH 24 DEGREES 54 MINUTES 14 SECONDS WEST, 284.98 FEET, ALONG THE CENTERLINE OF SUTTON ROAD; THENCE SOUTH 20 DEGREES 54 MINUTES 41 SECONDS WEST, 446.60 FEET, ALONG THE CENTERLINE OF SUTTON ROAD, THENCE SOUTH 13 DEGREES 30 MINUTES 11 SECONDS WEST, 766.96 FEET, ALONG THE CENTERLINE OF SUTTON ROAD; THENCE SOUTH 13 DEGREES 37 MINUTES 11 SECONDS WEST, 800.60 FEET, ALONG THE CENTERLINE OF SUTTON ROAD TO THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 9 AFORESAID, SAID POINT ALSO BEING THE NORTHWEST CORNER OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 16 AFORESAID; THENCE SOUTH 0 DEGREES 02 MINUTES 49 SECONDS EAST, 1298.74 FEET, ALONG THE WEST LINE OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 16 AFORESAID AND THE CENTERLINE OF SUTTON ROAD TO THE SOUTH LINE OF THE NORTH 1298.73 FEET OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 16 AFORESAID; THENCE NORTH 89 DEGREES 46 MINUTES 57 SECONDS WEST, 1320.08 FEET, ALONG SAID SOUTH LINE TO THE WEST LINE OF THE NORTHWEST QUARTER OF SECTION 16 AFORESAID; THENCE SOUTH 0 DEGREES 07 MINUTES 02 SECONDS EAST 689.23 FEET, ALONG THE WEST LINE OF THE NORTHWEST QUARTER OF SECTION 16 AFORESAID TO THE NORTH LINE OF ILLINOIS ROUTE 62 (ALGONQUIN ROAD) AS DEDICATED BY DOCUMENT NUMBER 11194092; THENCE SOUTH 76 DEGREES 04 MINUTES 05 SECONDS EAST, 568.05 FEET ALONG SAID NORTH LINE TO THE WEST LINE OF THE EAST 768 FEET OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 16 AFORESAID; THENCE NORTH 0 DEGREES 02 MINUTES 49 SECONDS WEST, 206.77 FEET ALONG SAID WEST LINE TO THE NORTH LINE OF THE SOUTH 710 FEET OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 16 AFORESAID; THENCE SOUTH 89 DEGREES 48 MINUTES 31 SECONDS EAST, 768.01 FEET ALONG SAID NORTH LINE TO THE WEST LINE OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 16 AFORESAID AND THE CENTERLINE OF SUTTON ROAD; THENCE SOUTH 0 DEGREES 02 MINUTES 49 SECONDS EAST, 425.32 FEET ALONG THE WEST LINE OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 16 AND THE CENTERLINE OF SUTTON ROAD TO THE NORTH LINE OF ILLINOIS ROUTE 62 (ALGONQUIN ROAD) AS DEDICATED BY DOCUMENT NUMBER 11194092; THENCE SOUTHEASTERLY 593.63 FEET, ALONG THE NORTHERLY LINE OF ILLINOIS ROUTE 62 (ALGONQUIN ROAD) BEING AN ARC OF A CURVE, CONCAVE TO THE SOUTHWEST, HAVING A RADIUS OF 5779.65 FEET AND A CHORD BEARING OF SOUTH 67 DEGREES 19 MINUTES 10 SECONDS EAST TO A POINT OF TANGENCY; THENCE SOUTH 64 DEGREES 22 MINUTES 37 SECONDS EAST, 1385.83 FEET ALONG THE NORTH LINE OF ILLINOIS ROUTE 62; THENCE SOUTH 67 DEGREES 42 MINUTES 37 SECONDS EAST, 207.06 FEET ALONG THE NORTH LINE OF ILLINOIS ROUTE 62 (ALGONQUIN ROAD) PER PLAT OF HIGHWAYS RECORDED AS DOCUMENT NUMBER 97313023 TO THE INTERSECTION WITH A LINE DRAWN FROM A POINT ON THE CENTERLINE OF ILLINOIS ROUTE 62 ACCORDING TO DOCUMENT NUMBER 11194092, 9.73 FEET NORTHWESTERLY (AS MEASURED ALONG SAID CENTERLINE) OF THE EAST LINE OF LOT 10 IN COUNTY CLERK'S DIVISION OF THE SOUTHEAST QUARTER OF SECTION 16 AFORESAID TO A POINT ON THE NORTH LINE OF SAID LOT 10 WHICH IS 6.00 FEET WEST OF THE NORTHEAST CORNER THEREOF; THENCE

NORTH 0 DEGREES 00 MINUTES 28 SECONDS WEST, 615.30 FEET, ALONG SAID LINE TO THE NORTH LINE OF SAID LOT 10; THENCE NORTH 89 DEGREES 48 MINUTES 31 SECONDS WEST, 0.84 FEET, ALONG THE NORTH LINE OF SAID LOT 10 TO THE SOUTHWEST CORNER OF THE FOLLOWING DESCRIBED PARCEL OF LAND; THENCE NORTH 0 DEGREES 28 MINUTES 25 SECONDS EAST, 116.78 FEET; THENCE SOUTH 89 DEGREES 12 MINUTES 29 SECONDS EAST, 648.78 FEET TO THE EAST LINE OF SAID LOT 14; THENCE NORTH 0 DEGREES 05 MINUTES 49 SECONDS EAST, 649.72 FEET, ALONG SAID EAST LINE AND THE WEST LINE OF LOT 10 IN SAID SCHOOL TRUSTEE'S SUBDIVISION TO THE NORTH LINE OF THE SOUTH 104 FEET OF SAID LOT 10; THENCE SOUTH 89 DEGREES 47 MINUTES 07 SECONDS EAST, 639.89 FEET ALONG SAID NORTH LINE TO A LINE 20.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID LOT 10; THENCE SOUTH 0 DEGREES 07 MINUTES 46 SECONDS WEST, 1160.99 FEET, ALONG SAID PARALLEL LINE TO THE NORTHERLY LINE OF BRINKER ROAD PER PLAT OF HIGHWAYS RECORDED AS DOCUMENT NUMBER 97313023 THENCE; NORTH 62 DEGREES 28 MINUTES 45 SECONDS EAST, 21.62 FEET, ALONG SAID NORTHERLY LINE TO THE INTERSECTION WITH A LINE 660 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF THE SOUTHEAST QUARTER OF SECTION 16 AFORESAID; THENCE NORTH 0 DEGREES 10 MINUTES 32 SECONDS EAST, 391.50 FEET ALONG SAID PARALLEL LINE TO THE NORTH LINE OF THE SOUTHEAST QUARTER OF SECTION 16 AFORESAID; THENCE SOUTH 89 DEGREES 48 MINUTES 31 SECONDS EAST 0.54 FEET, ALONG THE NORTH LINE OF THE SOUTHEAST QUARTER OF SECTION 16 AFORESAID AND THE SOUTH LINE OF LOT 15 IN SCHOOL TRUSTEE'S SUBDIVISION OF THE NORTHEAST QUARTER OF SECTION 16 AFORESAID TO THE SOUTHEAST CORNER OF SAID LOT 15; THENCE NORTH 0 DEGREES 07 MINUTES 46 SECONDS EAST 983.14 FEET ALONG THE EAST LINE OF SAID LOT 15 AND THE EAST LINE OF LOT 10 IN SAID SCHOOL TRUSTEE'S SUBDIVISION TO THE SOUTH LINE OF THE NORTH HALF OF LOT 10 IN SCHOOL TRUSTEE'S SUBDIVISION OF THE NORTHEAST QUARTER OF SECTION 16 AFORESAID; THENCE NORTH 89 DEGREES 46 MINUTES 26 SECONDS WEST 660.02 FEET ALONG THE SOUTH LINE THE NORTH HALF OF SAID LOT 10 TO THE WEST LINE OF SAID LOT 10; THENCE NORTH 0 DEGREES 05 MINUTES 49 SECONDS EAST 353.91 FEET ALONG THE WEST LINE OF SAID LOT 10 AND THE WEST LINE OF LOT 7 IN SCHOOL TRUSTEE'S SUBDIVISION OF THE NORTHEAST QUARTER OF SECTION 16 AFORESAID TO THE INTERSECTION WITH A LINE 629.63 FEET SOUTH OF AND PARALLEL WITH THE NORTH LINE OF SAID LOT 7; THENCE SOUTH 89 DEGREES 44 MINUTES 21 SECONDS EAST 660.22 FEET ALONG SAID PARALLEL LINE TO THE EAST LINE OF SAID LOT 7; THENCE NORTH 0 DEGREES 07 MINUTES 46 SECONDS EAST 629.63 FEET ALONG THE EAST LINE OF SAID LOT 7 TO THE NORTHEAST CORNER THEREOF; THENCE NORTH 89 DEGREES 44 MINUTES 21 SECONDS WEST 990.87 FEET ALONG THE NORTHERLY LINE OF SAID LOT 7 AND THE SOUTHERLY LINE OF LOTS 2 AND 3 IN SCHOOL TRUSTEE'S SUBDIVISION OF THE NORTHEAST QUARTER OF SECTION 16 AFORESAID TO THE SOUTHEAST CORNER OF THE WEST HALF OF SAID LOT 3; THENCE NORTH 0 DEGREES 04 MINUTES 50 SECONDS EAST 655.83 FEET ALONG THE EAST LINE OF THE WEST HALF OF SAID LOT 3 TO THE NORTHEAST CORNER OF SAID WEST HALF AND THE NORTH LINE OF THE NORTHEAST QUARTER OF SECTION 16 AFORESAID, SAID NORTH LINE ALSO BEING THE SOUTH LINE OF THE SOUTHEAST QUARTER OF SECTION 9 AFORESAID; THENCE SOUTH 89 DEGREES 42 MINUTES 58 SECONDS EAST 806.73 FEET ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER OF SECTION 9 AFORESAID TO THE INTERSECTION WITH A LINE 3124.88 FEET EAST OF THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 9 AFORESAID AND PARALLEL WITH THE WEST LINE OF THE SOUTHEAST QUARTER OF SECTION 9 AFORESAID; THENCE NORTH 0 DEGREES 24 MINUTES 28 SECONDS EAST 1311.81 FEET ALONG SAID PARALLEL LINE TO THE NORTH LINE OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 9 AFORESAID; THENCE NORTH 89 DEGREES 45 MINUTES 24 SECONDS WEST 47.80 FEET ALONG THE NORTH LINE OF THE SOUTHEAST

QUARTER OF THE SOUTHEAST QUARTER OF SECTION 9 AFORESAID TO THE SOUTHEAST
CORNER OF THE WEST 13 ACRES OF THE NORTHEAST QUARTER OF THE SOUTHEAST
QUARTER OF SECTION 9 AFORESAID; THENCE NORTH 0 DEGREES 15 MINUTES 51
SECONDS EAST 1311.77 FEET ALONG THE EAST LINE OF SAID WEST 13 ACRES TO THE
NORTH LINE OF THE SOUTHEAST QUARTER OF SECTION 9 AFORESAID AND THE SOUTH
LINE OF THE RESUBDIVISION OF LOTS 3 THROUGH 9 IN GOOSE LAKE SUBDIVISION,
RECORDED DECEMBER 26, 1984 AS DOCUMENT NUMBER 27383221; THENCE NORTH 89
DEGREES 47 MINUTES 50 SECONDS WEST 131.93 FEET ALONG THE SOUTH LINE OF SAID
RESUBDIVISION TO THE SOUTHEAST CORNER OF LOT 4 IN SAID RESUBDIVISION;
THENCE NORTH 06 DEGREES 13 MINUTES 22 SECONDS EAST 423.32 FEET ALONG THE
EAST LINE OF SAID LOT 4 TO AN ANGLE POINT ON THE EAST LINE OF SAID LOT 4;
THENCE NORTH 01 DEGREES 50 MINUTES 28 SECONDS EAST 261.00 FEET ALONG THE
EAST LINE OF SAID LOT 4 TO AN ANGLE POINT ON THE EAST LINE OF SAID LOT 4;
THENCE NORTH 23 DEGREES 44 MINUTES 51 SECONDS WEST 986.34 FEET ALONG THE
EAST LINE OF SAID LOT 4 TO THE NORTHEAST CORNER OF SAID LOT 4; THENCE NORTH
89 DEGREES 32 MINUTES 35 WEST 541.27 FEET ALONG THE NORTH LINE OF SAID LOT 4
TO THE NORTHWEST CORNER THEREOF AND THE PLACE OF BEGINNING, ALL IN
TOWNSHIP 42 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK
COUNTY, ILLINOIS.

PARCEL 2:

THE NORTH HALF OF LOT 10 AND LOT 7 (EXCEPT THE NORTH 629.63 FEET THEREOF) IN
SCHOOL TRUSTEE'S SUBDIVISION OF THE NORTHEAST QUARTER OF SECTION 16,
TOWNSHIP 42 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK
COUNTY, ILLINOIS.

PARCEL 3:

THE SOUTH 2 RODS OF THE WEST 1 ROD OF LOT 1 AND THE WEST ROD OF LOTS 8, 9 AND
16 IN SCHOOL TRUSTEE'S SUBDIVISION IN THE NORTHEAST 1/4 OF SECTION 16,
TOWNSHIP 42 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, TOGETHER
WITH THAT PART OF THE SOUTHEAST 1/4 OF SAID SECTION 16, LYING BETWEEN THE
WEST LINE OF SAID LOT 16 EXTENDED SOUTH TO THE BARRINGTON AND DUNDEE
ROAD AND A LINE 1 ROD EAST OF THE WEST LINE OF SAID LOT 16 EXTENDED SOUTH TO
SAID ROAD; ALL IN COOK COUNTY, ILLINOIS.

PARCEL 4:

THE WEST 16 2/3 FEET OF THAT PART OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF
SECTION 16, TOWNSHIP 42 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN,
DESCRIBED BY COMMENCING AT A POINT INT THE EAST LINE OF SAID SECTION 16,
2710.4 FEET SOUTH OF THE NORTHEAST CORNER OF THE SAID SECTION, BEING A POINT
IN THE CENTER LINE OF BARRINGTON ROAD; THENCE 62 DEGREES 09 MINUTES WEST
ALONG SAID CENTER LINE 401.1 FEET FOR A POINT OF BEGINNING; THENCE
CONTINUING SOUTH 62 DEGREES 09 MINUTES WEST ALONG SAID CENTER LINE 321.0
FEET; THENCE NORTH 311.6 FEET; THENCE EAST 198.6 FEET; THENCE SOUTH 27
DEGREES 51 MINUYTES EAST 183.0 FEET TO THE POINT OF BEGINNING, IN COOK
COUNTY, ILLINOIS.

P.I.N.s.: 01-09-203-002, 01-09-204-007, 01-09-302-003, 01-09-303-005, 01-09-400-005,01-
09-400-006, 01-09-402-001, 01-16-101-002, 01-16-102-002, 01-16-200-006, 01-16-201-012, 01-
16-301-002, 01-16-400-001, 01-16-400-016

Commonly known as:  311 Algonquin Road, Barrington Hills, Illinois 60010 (the "Property").

3.      Based on the evidence submitted at trial, Defendants Royalty Properties, LLC, Cannon Squires Properties, LLC, Richard Kirk Cannon, and Meryl Squires Cannon are each, jointly and severally, indebted to Plaintiff in the following amounts:

| | |
|---|---|
| Principal: | $ 14,518,030.79 |
| Interest: | $ 11,962,500 |
| Late Fees: | $ 740,904.67 |
| Property Taxes: | $ 487,962.37 |
| Property Expenses: | $ 148,850.62 |
| Total: | $ 27,858,248.45 |

4.      That in said Mortgage, Guaranty, and Note it is provided that Plaintiff is entitled to reasonable attorneys' fees and costs; that the above judgment amount is exclusive of legal fees, and that issue of fees and costs are hereby deferred until the sale is complete and the deficiency is entered and shall be addressed by the Court at that time by petition.

5.      That under the provisions of said Mortgage the costs of this Foreclosure are an additional indebtedness for which the Plaintiff should be reimbursed, and that such expenses are deferred until the sale is complete and the deficiency is entered and shall be addressed by the Court at that time.

6.      That the rights and interest of all the other parties to this cause in and to the Property herein described are inferior to the lien of the Plaintiff heretofore mentioned on the Property.

7.      That the Property is not residential as defined in 735 ILCS 5/15-1219.

8.      That, prior to this date, the Mortgagors (a) have been served with summons or by publication, and (b) have otherwise submitted to the jurisdiction of this court, and the redemption period has been waived pursuant to 735 ILCS 5/15-1601(b) in paragraph 27 of the Mortgage.

IT IS THEREFORE ORDERED AND ADJUDGED that Judgment of Foreclosure and Sale is granted in favor of Plaintiff.

IT IS THEREFORE ORDERED AND ADJUDGED that the Subject Property described above, together with all improvements thereon and appurtenances belonging thereto or so much thereof as may be necessary to pay the amounts found due and which may be sold separately without material injury to the parties in interest, at public venue in this county, to the highest and best bidder for cash by

the Selling Officer appointed by order of this Court or the Sheriff or official usually appointed to conduct foreclosure sales in this county.

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiff, or Plaintiff's agent, give public notice of the time, place and terms of said sale by publishing the same at least once in each week for three consecutive calendar weeks (Sunday through Saturday), the first such notice to be published not more than forty-five days prior to the sale and the last such notice to be published not less than seven days prior to the sale; that said notice shall be by an advertisement in a newspaper circulated to the general public in the County in which the real estate is located, in the section where legal notices are commonly placed and by a separate advertisement, which may not be in the same newspaper, in the section where real estate, other than real estate being sold in a legal proceeding, is commonly advertised to the public. Provided, however, that where said newspaper does not have separate legal and real estate sections, a single advertisement shall be sufficient; that said sale may be adjourned from time to time at the discretion of the Plaintiff provided, however, that if the adjourned sale date is to occur less than sixty (60) days after the last scheduled sale, notice of any adjourned sale need not be published; and notice to the parties need only be given once, not less than 5 days prior to the day of the adjourned sale; that the Plaintiff or any of the parties to this cause may become the purchaser or purchasers at such sale; that upon such a sale being made, said Selling Officer execute and deliver to the purchaser or purchasers a certificate or certificates of sale and record a duplicate thereof as required by law.

IT IS FURTHER ORDERED AND ADJUDGED that said Selling Officer upon holding such sale, shall with all convenient speed report the same to the court for its approval and confirmation, and shall likewise report the distribution of the proceeds of sale and the acts and doings in connection therewith; that out of the proceeds of such sale, the selling officer shall make distribution in the following order or priority:

    (a)    For his fees, disbursements and commissions on such sale;

    (b)    To the Plaintiff, the sum of the principal balance and the accrued interest mentioned in paragraph 3 of this Judgment with interest thereon at the lawful rate, together with all costs taxed herein.

IT IS FURTHER ORDERED AND ADJUDGED that the Selling Officer take receipts from the respective parties to whom he may have made payment as aforesaid, and file the same with his report of sale and distribution in this Court; that, if after the payments of all the foregoing items, there shall be a remainder, he hold the surplus subject to the further order of this court, and that if there be not sufficient funds to pay in full the amounts found due herein, he specify the amount of deficiency in his report of sale; and further, that said deficiency shall stand either

as a lien and apply against the rents, issues and profits accruing from said premises, or as a personal deficiency against the Defendants upon this Court's order approving the Selling Officer's report of sale and distribution.

IT IS FURTHER ORDERED AND ADJUDGED that upon confirmation of the sale by the Court and upon production to the Selling Officer or his successor of said certificate or certificates of sale by the legal holder thereof, said Selling Officer shall execute and deliver to the legal holder of said certificate or certificates of sale a good and sufficient deed of conveyance of said premises; and after the 30th day after the Judicial sale is confirmed, the grantee or grantees in such deed or his or her legal representative or assigns be let into possession of said premises, and that any of the parties to this cause who shall be in possession of said premises or any portion thereof, or any person who may have come into such possession under them, or any of them, since the commencement of this suit shall, upon the production of said Selling Officer's deed of conveyance surrender possession of said premises to said grantee or grantees, his or her representatives or assigns, without notice to any party or further order of this Court, and in default of so doing, a writ of assistance shall issue.

IT IS FURTHER ORDERED that Plaintiff shall mail a copy of the Judgment of Foreclosure to all parties within five (5) days after the date of entry.

*Order prepared by:*
Henderson Parks, LLC
140 S. Dearborn St., Suite 1020
Chicago, Illinois 60603
Firm No. 60047

ENTERED:

_____
Judge

# EXHIBIT 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| FOREST PRESERVE DISTRICT OF<br>COOK COUNTY, ILLINOIS, | )<br>) | |
| | ) | No. 18 L 315 |
| Plaintiffs, | ) | (formerly No. 09 CH 18291) |
| | ) | |
| v. | ) | Commercial Calendar N |
| | ) | |
| ROYALTY PROPERTIES, LLC,<br>CANNON SQUIRES PROPERTIES LLC,<br>RICHARD KIRK CANNON, MERYL<br>SQUIRES CANNON, ROYALTY<br>FARMS LLC, MCGINLEY PARTNERS,<br>LLC, UNKNOWN OWNERS AND NON-<br>RECORD CLAIMANTS, | )<br>)<br>)<br>)<br>)<br>)<br>) | Honorable Margaret Ann Brennan |
| | ) | |
| Defendants. | )<br>) | |

## MEMORANDUM OF OPINION

This cause coming for trial before the Court, the parties being at issue on Plaintiff, Forest Preserve District of Cook County, Illinois's (the "Forest Preserve" or "FPD") Complaint; Royalty Properties, LLC ("Royalty Properties"), Cannon Squires Properties, LLC ("Cannon Squires Properties"), Richard Kirk Cannon ("Mr. Cannon"), Meryl Squires-Cannon ("Mrs. Cannon")(collectively, the "Cannons"), and Merix Pharmaceutical Corporation's ("Merix") affirmative defenses and counterclaim; and Plaintiff's affirmative defenses to the counterclaim. Trial commenced on May 20, 2019 and evidence concluded on May 24, 2019.

The Court having heard and considered the testimony, having received and reviewed the evidence, makes the following findings of fact and conclusions of law.

The following witnesses were called at trial:

Robert Moos: a mortgage broker with Pillar Financial who offered credible testimony concerning early attempts at obtaining financing.

Steven Terborg: a commercial banker with Amcore from 2006-2010, testified credibly to the events surrounding the financing provided by Amcore for the acquisition of the Property.

Todd Younger: Senior Vice President at Amcore with 20+ years of experience and a team leader in the commercial banking division of Amcore bank, testified credibly particularly to the

terms and security the bank would require for providing the loan and the paydown for refinancing.

John Hecht: (by evidence deposition) Executive Vice President at Amcore and member of the loan committee, testified credibly as to the loan provided being temporary financing, and that Amcore never guaranteed a future loan.

Nick Mitchell: testified credibly as to his search and production of documents at KSN, the law firm that represented the Cannons at the closing.

Lee Neubecker: expert in computer forensics, testified credibly as to the metadata of the KSN files authenticated by Mitchell.

Meryl Squires Cannon: Founder and CEO of Merix pharmaceutical and a Defendant in this action, testified conveniently as to the events surrounding the purchase of the property.

Richard Kirk Cannon: Patent attorney and a Defendant in this action, testified as to the events surrounding the purchase of the property.

Scott Gudmundson: Attorney representing Amcore at the closing, testified credibly as to the preparation of the closing documents, and closing.

Jacques Kolzow: Banker at Amcore, BMO Harris, and Bayview, testified credibly as to the loan payment history.

Joe Majer: Banker previously at Bayview, testified credibly as to documents maintained in the ordinary course of business at Bayview, and that as of December 31, 2012 the amount due on the note was $20,550,333.45.

Dennis Wilson: Attorney for the McGinley's, testified credibly as to the closing and drafting of the Intercreditor Agreement.

Stephen Hughes: CFO at Forest Preserve since 2014, testified credibly as to the amount and interest owed, prepared a non-compounded interest calculation of $11,962,500, property taxes in the amount of $173,830.17.

The Court having heard and considered the testimony, having received and reviewed the evidence, makes the following findings of fact and conclusions of law.

## Findings of Fact

This Court's findings of fact are based on the evidence and the reasonable inferences drawn from that evidence. In evaluating the credibility of the witnesses the Court took into consideration the witness' ability and opportunity to observe, memory, manner, interest, bias, qualifications, experience, and any previous inconsistent statement or act by the witness. Attached to this order are lists of all exhibits accepted and reviewed by the Court.

## Introduction

The Property at issue in this foreclosure case is a nearly 400-acre horse farm located in Barrington Hills, commonly known as Horizon Farms or alternatively Royalty Farms. At the time of sale the Property consisted of a large residence known as Hunt Ridge, a guest house, a farm house, a duplex staff house, a bunk house, staff apartment building, race track, hunter jumper arena, jumper trail, run in shed, dog kennel, workshop, at least nine barns, at least six pastures, and at least nineteen paddocks. DX1 The Property is zoned R1 residential by the Village of Barrington Hills, subject to a conservation easement which restricted the division of the Property to no more than 8 parcels, and a portion of the property was subject to the Goose Lake Subdivision's restrictive covenants. DX 5-6 and 9. Prior to its sale in 2006, the Property was owned by the McGinley family through Horizon Farms, Inc.

Mr. and Mrs. Cannon reside in the Goose Lake subdivision in Barrington Hills. Mr. Cannon is a patent attorney, and Mrs. Cannon is the founder and CEO of Merix Pharmaceutical, Corp. ("Merix").

Prior to October 2006, the Cannons through Royalty Farms, LLC leased three barns on the Property from Horizon Farms, Inc. for the pasturing, training, breeding, non-competitive showing, and stabling of their horses. PX5, DX8 Mrs. Cannon testified that at their peak the Cannons through their various entities owned 56 horses. Around August 2006, the Cannons learned that that the McGinley family was placing the Property for sale. PX6

## Auction

The Property was set to be sold at auction by Sheldon Good and Co. with the final bids to be submitted by October 25, 2006 DX1. PX6. As part of the bidding process, interested parties had to submit $750,000 in in initial earnest money. PX14 If the bidder's offer were accepted, the bidder would then have to submit additional earnest money within three days of the acceptance of their bid equal to 10% of the total purchase price minus the initial earnest money. PX14. The purchase agreement required a cash purchase and that the purchase close within 45 days of acceptance by seller. PX14 On October 25, 2006 the Cannons submitted a sealed bid to purchase Horizon Farms in the amount of $18,000,000 or $100,000 over the highest *bona fide* bid, whichever was higher. PX14 As part of their bid the Cannons sent a letter to Robert, Jim, and Maggie McGinley. PX13 DX16. In that letter, the Cannons stated that they intended to use the property for, *inter alia*, building the farm into a "premier breeding and training horse farm" which would train horses for the Kentucky Derby, restoring Hunt Ridge and using it to hold meetings and events, operating a summer camp, growing coneflowers and daises for Merix, extending the race track, renovating the barns, extending the riding and jump trail, and building a dream home on the property. PX13 DX16 In that same letter, the Cannons promised that they would not split the property into parcels. PX13 DX16. The Cannons initial bid was rejected because of the $100,000 provision, and because it was subject to the seller's approval of financing and therefore not a cash offer. PX13-14 DX16-17. The Cannons second bid was also rejected because it still contained the $100,000 provision and a 20-day period to provide the rest of the earnest money, instead of the 3-day period prescribed by the purchase and sale agreement. PX14-15 DX18-20. The Cannons were ultimately required to sign a rider modifying their bid to exclude the $100,000 provision, or else the McGinleys would not consider their offer. PX16

3

DX24-25. At the time they submitted their bid, the Cannons had not secured financing to fund the purchase. On November 1, 2006, the Cannons completed their deposits to the escrow agent in the total amount of $1,935,000 which included auction fees. DX22-23. The Cannon's bid was accepted and the Cannons and Horizon Farms, Inc. entered into a purchase and sale agreement on November 6, 2006. PX17-18 DX26 and 30.

## Quest for Financing

As early as August 2006 through the December 21, 2006 closing, the Cannons sought to obtain financing for the purchase of the Property. Per the testimony of Mr. and Mrs. Cannon the Cannons split their efforts, with Mrs. Cannon primarily seeking to obtain financing from lending institutions and Mr. Cannon liquidating assets in order to complete their earnest money payments and obtain money to fund the purchase. Mrs. Cannon expressed a willingness to use her company assets and the Cannons' Florida and Barrington homes as collateral. PX7 DX10. The Cannons initially approached Robert Moos for help in obtaining financing, as well as several other potential lenders. Eventually the Cannons got into contact with Amcore Bank who ultimately financed most of the purchase.

Merix created a proposal dated October 5, 2006 outlining the planned usage of the Property ("Merix Proposal") which included, restoring the Property to a "top Thoroughbred Racehorse Training farm", leasing the facility for training racehorses, leasing space to the polo club, growing coneflowers and daises, performing laboratory research and development of Merix's equine line of products, storing inventory, potentially developing and selling two estates on the North End of the Property, leasing property for charity events, leasing barns for sport and show horse boarders, and a bagged fertilizer business. PX19. Additionally, the Proposal indicted that there were leases on the property that generated $140,000 annually. PX19.

## Mr. Moos

Robert Moos ("Mr. Moos") testified at trial that in 2006 he worked as a residential mortgage banker at Pillar Financial, and that he knew the Cannons through Mrs. Cannon's daughter Dori Squires ("Dori"). He also testified that he was approached by Mrs. Cannon regarding obtaining financing for the purchase of the Property, and that he told her that the Cannons would require a commercial loan. As his business only dealt with residential loans, his practice was to broker out any commercial business to his contacts who worked in that area, which he did for the Cannons. Based on his ability to recollect events, and overall demeanor while testifying, the Court found Mr. Moos to be a credible witness. During cross examination, Defendants' counsel attempted to elicit answers from Mr. Moos to help establish that the Cannons' intentions in purchasing the property were purely residential in nature, and that they did not intend to make a commercial loan. It was the Court's impression from Mr. Moos' answers that he did not agree with that characterization, and he emphasized that due to the nature of the Property at the time of sale, the Cannon's required commercial financing. Mr. Moos testimony is corroborated by the exhibits produced at trial.

From August 24, 2006 through September 6, 2006 Mr. Moos and Dori Squires exchanged emails in which Mr. Moos indicated that he had not heard back from his commercial lending contacts regarding financing, commenting that commercial lenders "move at a snails pace" *sic*.

4

and are "slow as molasses". PX7 DX10 Later on October 6, 2006 he emailed Dori and told her that the fact that the Property was being sold at auction made obtaining financing difficult because the price was uncertain.

From September 7, 2006 to October 18, 2006 Mr. Moos and Mrs. Cannon exchanged emails regarding obtaining financing from a commercial lender identified only as "the investor". PX7&9. Mr. Moos indicated that the investor wanted a 20% down payment and that he had discussed cross collateralizing the Cannons' Florida and Barrington Homes with the investor and indicated that the investor was not very interested in that. PX7&9. Mrs. Cannon also discussed having Robert McGinley taking up a "second position" to the investor as well as having Merix lease part of the Property. On October 18, 2006, Mrs. Cannon told Robert Moos that she intended to put forth bid in an amount greater than the next highest bidder ensuring that she would be the highest bidder. Mr. Moos responded by saying that he did not have a definitive answer for her regarding financing, did not have a loan approval, and could not guaranty that they could obtain financing. PX10.

From November 7, 2006 through November 14, 2006, the Cannons and Mr. Moos exchanged emails regarding getting an appraisal done for the property and obtaining financing. PX18. Mr. Cannon also indicated that other bidders were still interested in the Property, and were willing to increase their bids. PX18.

### Other Lenders

As early as September 28, 2006, the Cannons had learned that JP Morgan would not loan on more than 50% percent of the property. PX8.

On November 24, 2006, Mrs. Cannon spoke with a representative from Barrington Bank and Trust, who had expressed an interest in assisting with the end financing once the Cannons had bought themselves more time with interim financing. PX21. That representative indicated that the financing would be a commercial loan. PX21.

From November 24, 2006 through December 11, 2006, the Cannons communicated with Larry Teter at Capital Chicago, LLC regarding obtaining financing. PX21. Mr. Teter approached Saxony Capital of Chicago and Broadway Bank regarding obtaining first mortgage financing commitments for the purchase of the Property. PX21.

On November 30, 2006, Mr. Cannon left a voicemail for Thomas Wischhusen of The Northern Trust Company regarding financing.  Mr. Cannon indicated that Merix "would probably be the driving force behind any loans granted; and the fact that Merix would be willing to move its banking accounts and relationships to Northern Trust if it would help to incentivize this loan." Mrs. Cannon followed up via email later that afternoon. PX23.

From December 4, 2006 through December 6, 2006, Mrs. Cannon emailed Dick Armstrong and Alane Morabit at Love Funding in an attempt to secure financing, which included sending them Merix financial information. PX24.

## Amcore

Mr. Terborg testified credibly to the events leading up to and after the closing. Mr. Terborg testified that due to the amount of money involved, the loan for the Property would have to be approved by Amcore's loan committee and that he worked with his immediate supervisor Todd Younger to prepare the loan presentation. He testified that at the closing he did not recall Mr. Cannon asking him to postpone the closing, protesting about the interest rate, or any other disputes, but does recall Mr. Cannon reviewing documents and that he had some critiques. Mr. Terborg also testified that subsequent to the closing he spoke with the Cannons regarding various documents which would be required for the bank to consider in refinancing the loan, and that he was involved in the execution of the first modification of loan documents in December of 2007. Also, the purpose of the 90-day extension was to give the Cannons time to obtain funds and documentation for refinancing.

Mr. Younger testified credibly regarding Amcore's willingness to extend a bridge loan for a year, with the expectation that a modified amortized financing arrangement of $4-5 million could be negotiated before the 1-year term expired. Mr. Younger did not attend the closing but testified that he was available by phone and spoke with Mr. Terborg. He testified that the royalties Mr. Cannon was receiving from a patent license would be sufficient to service the interest for three years. He recalled attending a party after the closing, and that the Cannons were overall happy, and expressed appreciation for all their hard work. Mr. Younger's Testimony generally corroborated Mr. Terborg's testimony, as did John Hecht's evidence deposition.

From November 17, 2006 through December 14, 2006, Dori and Mrs. Cannon sent various documents to Mr. Younger and Mr. Terborg, including the Merix Proposal, Mrs. Cannon's 2005 tax return, the accepted bid, Merix's balance sheets for 2004-2005, the farm lease between Royalty Properties, LLC and Merix, 2005-2006 financial reports for Merix, profit and loss reports for 2006, and an executive summary outlining Merix's prospective sources of income. PX19 DX34-36 39-40 46. On November 21 and 29, 2006 Mr. Cannon sent Mr. Terborg personal financial statements indicating that he had a net worth of approximately $13,000,000. PX20. On November 30, 2006, Royalty Properties LLC was formed as a Florida limited liability company. DX 31, 47. The Cannons testified that this was done at the instruction of Amcore. On December 7, 2006, Mrs. Cannon, Mr. Terborg, and Mr. Hecht planned on visiting the Property. On December 15, 2006, Mrs. Cannon emailed Mr. Terborg and Mr. Younger regarding Glaxo's willingness to walk away from the ongoing lawsuit with Merix.

On December 15, 2006, the loan presentation was delivered to the members of the loan committee. PX29. The proposal sought debt approval in the amount of $15,800,000 consisting of a $14,500,000 bridge loan to Royalty Properties, LLC and a $1,300,000 line of credit to Merix to be fully drawn at funding and used to fund the purchase of the Property. The loan committee was advised that the Cannons had put down 10% of the purchase price and were advised that the Cannons intended to put in a total of $3,550,000 at closing. DX42 The loan presentation represented that the borrowers intended to *inter alia* train thoroughbred racehorses, grow crops for use in Merix's business, as well as conduct research for Merix's new equine products, the exact same uses outlined in the Merix Proposal. PX19 DX42. The presentation also represented that main source of repayment on the loan would come from Merix Corporation's cash flow and lease payments to Royalty Properties, Mr. Cannon's income, as well as several "one-time

events" which included resolution of Merix's litigation with Glaxo SmithKline, execution of a distribution agreement with a Dutch pharmaceutical company, sale of RELEEV Products, Inc., and the execution of a collaborative license agreement. DX42. Additional sources of possible repayment included sale of the Cannon's Barrington home, and the sale of two of the eight parcels on the Property. DX42. The loan committee approved the loan on December 20, 2006 with several additional provisions being added at the committee's meeting. DX42. These included, maintaining a 90-day interest reserve, securing Mrs. Cannon's guarantee with her patent-license rights, obtaining a life insurance policy on Mrs. Cannon, subordinating any non-Amcore debts from Royalty Properties, LLC or Merix, and an agreement to apply the proceeds from the Dutch licensing deal to the debt or interest reserve. DX42.

Throughout the process of obtaining financing from Amcore, Mrs. Cannon met several times with Mr. Terborg and Mr. Younger. During these occasions she took notes detailing what was discussed. On November 28, 2006, she met with Younger and Terborg, where they discussed Merix and RELEEV, the general structure of the loan (e.g. 75% loan to value for $15,480,000-16,000,000 with line of credit to Merix and 1 year bridge loan), the loan committee presentation, placing a lien on the Florida home, and some of the financial documents they needed from Merix. PX28.

On November 29, 2006 Mrs. Cannon spoke with Mr. Terborg regarding what financial documents were needed from herself, Mr. Cannon, and Merix; the structure of the loan (one-year bridge loan and line of credit to Merix), drafting a longer term mortgage during the period of the bridge loan, as well as the fact that Amcore was relying on Merix for debt service. PX28.

On November 30, 2006 Mrs. Cannon spoke with Mr. Terborg regarding Merix's business information.

On December 6, 2006 Mrs. Cannon spoke with Mr. Terborg regarding financial information for the farm, and that there were $187,000 in expenses. PX28.

On December 7, 2006 Mr. Terborg indicated that others were on board, there was a tentative meeting with John Hecht on the 12th, and a board meeting on the 13th. PX28.

On December 8, 2006 Mrs. Cannon spoke with Mr. Younger and Scott, they indicated that it had been a long day, John Hecht still wanted to meet, and they did not have concurrence from the CFO regarding the loan due to the nature of the property, the conservation easement, the "giant burden" it would place on Merix, and ongoing litigation. PX28.

On December 14, 2006 Mrs. Cannon spoke with Mr. Younger and Mr. Terborg regarding the upcoming loan committee meeting, indicating that CCO was still not convinced, but that John Hecht and Nick were on board. PX28 They also discussed performing a pre-funding field exam, as well as what further financial documents the bank needed. Younger and Terborg indicated that it was still an evolving deal, but the terms were a one year bridge loan from $14,500,000-$14,512,500 with interest at 8.25%, a $1,300,000 line of credit to Merix with interest at 8.25%, and third mortgages on the Cannons' Florida and Barrington Hills homes. PX28.

On December 15, 2006 Steve Terborg discussed conducting the pre-funding field exam and Merix's financial information. PX28.

On December 19, 2006 Mrs. Cannon had a conference call with Mr. Terborg and Mr. Cannon discussing the loan presentation which was going to the committee, the terms of which were $14.5 million bridge loan to royalty properties, $1.3 million line of credit to Merix, the line of credit required an 80% ratio of the collateral (accounts receivable and inventory), the line of credit would be interest only for the first year at a rate of 8.25%, Merix would be required to maintain a 1.25 debt to service ration, Amcore would require a first lien on her assets, and the Cannons would act as guarantors. PX28 They also discussed what financial information the bank would need post-closing.

After the loan committee meeting on December 20, 2006 the Cannons met with Mr. Terborg and Mr. Younger where they asked whether the Cannons had the money to consummate the deal, and discussed the terms which were added by the loan committee including the patent license agreements, obtaining a key person insurance policy for Mrs. Cannon, using the proceeds from the Dutch licensing deal to pay down the loan, and providing 90-days of debt service at the closing. PX28.

### Drafting the Closing Documents and Closing

At trial Mr. Gudmundson testified credibly, as to the work he performed in preparing the loan documents. He testified that he received a call from Younger late in the afternoon on Friday December 15, 2006, and he began working on the documents on December 18, 2006. He worked with Zerman to complete the documents and found Zerman to be a "typical borrower attorney", and "thought he was doing his job". He testified that the marked copies sent to Zerman in the early morning of December 21, 2006 has approximately 20 marked pages, and he expected that Zerman would read and review those changes. He testified that he and the bank were surprised to learn the morning of the closing that the borrowers were short funds to close and required a $1,500,000 from the seller, and that the $1,500,000 loan from the seller is what necessitated the creation of the Inter Creditor Agreement. He testified credibly that when the parties left Chicago Title, everyone was aware that the Intercreditor Agreement was still being negotiated, which was "the whole damn point of leaving the signature page in escrow". He then testified that even though Zerman was not sent a final version of the Inter Creditor Agreement, but that he and Zerman had a telephone conference on December 22, 2006, when the transaction finally funded and closed.

The Court also heard the testimony of Dennis Wilson, who represented the McGinley family and Horizon Farms, Inc. at the closing. He could not recall many of the details of the closing, but generally corroborated Mr. Gudmundson's testimony. He also testified that Merix was never mentioned in relation to the Inter Creditor Agreement, and that the sole purpose of the Agreement was to establish priorities in the event of default. Both Gudmundson and Wilson's testimony is supported by the exhibits admitted at trial.

From December 18, 2006 though the morning of the closing December 21, 2006, Gudmundson worked with Zerman, Younger, and Terborg to draft the loan documents. PX31 Gudmundson worked essentially all day during that period. PX31 On December 18, 2006

Gudmundson emailed Zerman a preliminary closing checklist indicating which documents were to be provided and signed by each party. PX30 DX44-45 Zerman sent this to Mrs. Cannon who then sent it to Mr. Cannon. PX30 From approximately 2:00PM on December 20, 2006 through 2:40 AM the next morning Gudmundson sent multiple drafts of the loan documents with revisions indicated to Zerman, Terborg, and Younger, with the final marked copies being sent at 2:40 AM on December 21, 2006. PX32-35 and 37 DX50. A letter dated December 21, 2006 from Kovitz Shifrin and Nesbit states that the firm reviewed the loan documents on behalf of the borrowers. PX36. With the exception of the Inter Creditor Agreement, which was still being drafted, the parties executed and signed the loan documents on December 21, 2006 at Chicago Title. DX59-60. Among the loan documents was an addendum that modified the attorneys' fee provisions of the loan documents, which was executed at the request of Mr. Cannon. PX 44 Disbursement of funds and attachment of the signature page to the Intercreditor Agreement left in escrow completed the closing on December 22, 2006. PX49 DX62.

At approximately 9:30 AM, on December 22, 2006 Wilson sent Gudmundson a blacklined version of the Inter Creditor Agreement, which reflected changes that they had discussed the previous night. DX68, 70. The final version of the Inter Creditor Agreement was sent from Gudmudson's office to Wilson at 10:50 AM on December 22, 2006 DX71 74.

### Post Closing

Mr. Cannon testified at trial that the first time he expressed disagreement regarding the 360-day interest calculation was in an email to Terborg and Younger on February 09, 2007. The email was prompted by the January 2007 demand for payment. PX53 DX81. From August 2007 through December 2007, Mrs. Cannon and Terborg discussed refinancing the loan, with Terborg inviting Mrs. Cannon and Dori to a White Sox game. PX54 Mrs. Cannon sent Terborg various financial information from herself, Mr. Cannon, and Merix. PX54. Ultimately Amcore offered to extend the maturity date of the bridge loan for 90 days in order for Merix to complete a transaction for the sale of the RELEEV product line to British pharmaceutical company Meldex International, PLC. PX54 DX93-98, 100, 102-105 108. The parties executed a modification of loan documents ("First Modification"), which carried a $9,000 extension fee. DX 109. From late May 2008 through early June 2008, Mr. Cannon and Gudmundson negotiated the terms a second modification of loan documents, which increased the interest rate by 1%, extended the maturity date of the loan through June 21, 2008, and carried a $108,750 extension fee. DX117. On September 17, 2008, Merix opted not to renew its lease with Royalty Properties, LLC. On October 22, 2008, the parties entered into a third modification of loan documents, which reset the interest rate back to the base rate of 8.25%, extended the maturity date to September 21, 2009, and carried no extension fee. DX119.

The Cannons admitted in their testimony that in May of 2009, they intentionally defaulted on the loan by ceasing payment ostensibly because they disagreed with the interest calculation.

### Procedural History & Ancillary Litigation

This foreclosure action has been ongoing for over a decade and has a complex history involving several appeals and a number of ancillary lawsuits arising out of the purchase and

foreclosure of the Property. While the following information is rather voluminous, given Defendants' tendency to misrepresent the findings of this and other courts, the Court feels it is necessary.

Amcore filed the instant foreclosure action on June 8, 2009. On April 23, 2010, Amcore was closed by the Office of the Comptroller of the Currency, with BMO Harris acquiring Amcore's assets. On May 18, 2010, an order appointing a receiver was entered transferring possession of Horizon Farms to the Receiver. On June 27, 2013, the 14,500,000 promissory note was sold by BMO Harris to the Forest Preserve for $14 million. BMO Harris retained the $1,300,000 loan to Merix.

A judgment was entered on the Merix loan on August 30, 2013. In early 2014 Mr. and Mrs. Cannon met with BMO Harris regarding resolving the judgment on the Merix loan. The parties to the Merix loan entered into a settlement agreement on June 4, 2014 and executed a release and satisfaction of judgment on May 5, 2015.

On August 30, 2013, pursuant to the Forest Preserve's Motion for Summary Judgment, a judgment of foreclosure was entered in favor of the Forest Preserve. The Cannons' motion for leave to file affirmative defenses was denied. The Cannons appealed. On October 18, 2013, the Forest Preserve participated in the foreclosure sale and bid for the Property. The Forest Preserve was the highest bidder and received the certificate of sale for the Property. The sale was confirmed on May 5, 2014, and the Forest preserve acquired title to the Property on May 16, 2014, upon receipt of the sheriff's deed. On, May 17, 2016 the appellate court reversed the Circuit Court's decision to grant the Forest Preserve's motion for summary judgment and the decision to strike the affirmative defenses. *BMO Harris Bank, N.A. v. Royalty Props., LLC*, 2016 IL App (1st) 151338-U

On May 30, 2017, the Court reinstated the October 10, 2013 mortgagee-in-possession order. The Cannons appealed. On August 29, 2017, the appellate court reversed and remanded the order of May 30, 2017 that reinstated the mortgagee-in-possession. *Forest Pres. Dist. of Cook Cty. v. Royalty Props., LLC*, 2017 IL App (1st) 171564-U. On May 25, 2018 after conducting an evidentiary hearing, this Court entered an order appointing a receiver, the Cannon's appealed, and the Appellate Court affirmed this Court's order. Forest Pres. Dist. of Cook Cty. v. Royalty Props., LLC, 2018 IL App (1st) 181323. On January 25, 2019, Defendants' counsel Robert J. Slobig moved to withdraw his appearance on the grounds that he had not been paid. The Court was going to deny Mr. Slobig's request, but Mr. Cannon expressed that the Defendants had lost confidence in Mr. Slobig and would not be comfortable with him representing them. Mr. Slobig was allowed to withdraw his appearance, the trial date of February 25, 2019 was not moved. On February 22, 2019, the Court heard the Defendants' emergency motion to continue the trial, at the time Mr. Cannon was representing the parties due to the withdrawal of Mr. Slobig. Mr. Cannon argued that it would be a conflict of interest for him to represent Royalty Properties. Defendants' Motion was granted and the trial date was moved to May 20, 2019 in order to allow the Defendants to retain new counsel. On May 10, 2019 this Court entered partially summary judgment in favor of the Forest Preserve on Defendants' counterclaims arising out of the Truth in Lending Act, Fair Debt Collection

Practices Act, breach of contract based on the interest rate calculation, and fraud arising out of the intercreditor agreement, as well as Defendants' affirmative defenses based on the Truth in Lending Act.

On March 19, 2019 Royalty Properties, LLC filed for bankruptcy and an automatic stay of litigation against Royalty Properties, LLC was entered. This Court decided to proceed to trial on the claims that were not stayed by the bankruptcy proceedings. The Forest Preserve moved in the Bankruptcy Court to lift the automatic stay. After holding an evidentiary hearing from May 15, 2019 to May 16, 2019, Bankruptcy Judge Jacqueline P. Cox granted the Forest Preserve's motion for relief from automatic stay on May 17, 2019 stating that "the state court is free to proceed with the trial…" In a last ditch attempt to further delay the trial, on May 20, 2019 Defendants moved to enforce the bankruptcy stay arguing that Judge Cox had not waived the 14-day stay provided by Federal Rule of Bankruptcy Procedure 4001(a)(3). This Court found that Judge Cox's instruction to proceed with the trial was clear and proceeded with the trial. The Forest Preserve moved to clarify Judge Cox's order and on May 21, 2019 Judge Cox amended her order to clarify that Federal Rule of Bankruptcy Procedure 4001(a)(3) did not apply. *In re Royalty Props., LLC*, 2019 Bankr. LEXIS 1532

Including the instant action and the bankruptcy proceedings, there have been at least eight lawsuits arising from the sale of the Property and its foreclosure.

On May 15, 2014, the McGinleys filed a claim for breach of note and breach of guaranty against Royalty Properties and the Cannons based on the $1.5 million seller financing loan. 14 L 5231. On February 2, 2017, Judge John C. Griffin entered judgment in favor of the McGinleys in the amount of $8,320,669.43. The Cannons appealed that judgment twice, raising defenses stemming from the Illinois Corporate Survival Statute, the Illinois Interest Act, and arguing that the Inter Creditor Agreement barred the McGinleys' recovery. The trial court was affirmed in both instances. *McGinley Partners, LLC v. Royalty Props.*, LLC, 2018 IL App (1st) 171317; *McGinley Partners, LLC v. Royalty Props.*, LLC, 2018 IL App (1st) 172976.

On August 30, 2013, the Cannons filed a taxpayer lawsuit against the Forest Preserve arguing that the Forest Preserve's acquisition of the Property at the foreclosure sale violated the Forest Preserve District Act. The trial court granted summary judgment in favor of the Forest Preserve, and the appellate court affirmed. *Baker v. Forest Preserve District of Cook County*, 2015 IL App (1st) 141157, ¶ 10, 33 N.E.3d 745.

On September 23, 2014, Royalty Farms, LLC filed a claim for breach of lease against the Forest Preserve based on the 2007 farm lease entered between Royalty Farms, LLC and Royalty Properties, LLC, the Forest preserve filed a counterclaim for eviction, and Judge Martin C. Kelley awarded possession of the Property to the Forest Preserve. Subsequently, the appellate court reversed the order of summary judgment in the foreclosure action. Judge Kelley stayed the proceedings, but did not vacate the award of possession. Royalty Farms appealed, and the appellate court reversed the award of possession, and stayed the eviction proceedings pending the outcome of the instant foreclosure proceedings. *Royalty Farms, LLC v. Forest Pres. Dist. of Cook Cty.*, 2017 IL App (1st) 161409.

The Cannons attempted to contest the foreclosure action in federal court asserting theories of unconstitutional takings, and fraud. That action was dismissed with prejudice and affirmed on appeal. *Cannon v. Forest Pres. Dist. of Cook County*, 2014 U.S. Dist. LEXIS 61083; *Cannon v. Forest Pres. Dist. of Cook County*, 2015 U.S. Dist. LEXIS 24659; *Cannon v. Forest Pres. Dist.*, 2016 U.S. Dist. LEXIS 60729; and *Squires-Cannon v. Forest Pres. Dist.*, 897 F.3d 797 (7th Cir. 2018).

Mrs. Cannon filed a false arrest claim against the Forest Preserve in federal court after Forest Preserve District Police arrested her for criminal trespass on August 13, 2014 for entering the Property subsequent to the foreclosure sale.[1] Those claims were dismissed and the dismissal was affirmed on appeal. *Squires-Cannon v. Forest Pres. Dist.*, 2016 U.S. Dist. LEXIS 17693; *Squires-Cannon v. Forest Preserve District*, No. 15 C 6876, 2016 U.S. Dist. LEXIS 88405; *quires-Cannon v. White*, 864 F.3d 515 (7th Cir. 2017).

On February 15, 2019, the Cannons filed claims against the McGinleys, Gudmundson, and Wilson alleging fraud arising from the execution of the intercreditor agreement. 19 L1682.

<u>Analysis</u>

### Plaintiff's Verified Complaint

### Count I – Foreclosure on 331 Algonquin Road, Barrington Hills, Illinois

Forest Preserve has presented the Court with a Mortgage Loan Agreement, Mortgage Note, and Mortgage Security Agreement signed by Royalty Properties, LLC and Cannon Squires Property, LLC. Mr. Terborg and Mr. Gudmundson testified that the Cannons executed the loan documents at the closing on December 20, 2006, and while the Cannons refuse to confirm the authenticity of the loan documents at issue in this case, they did confirm that their signatures were on the signature page, and offered no compelling evidence to demonstrate that the documents were inauthentic. Under the terms of the Third Modification of Loan Documents the Defendants were to make monthly interest payments with the principal due on the Note's maturity date of September 21, 2009. The Cannons admit that in May 2019, they ceased making monthly interest payments and made no more payments toward the loan. As the Forest Preserve has presented compelling evidence that they are the holder of a valid mortgage and note, and that the Cannons are in default, the Forest Preserve is entitled to a judgment of foreclosure.

### Count II – Foreclosure on 2 Goose Lake Drive, Barrington Hills, Illinois

The Foreclosure of the Cannons' home at 2 Goose Lake Drive was not raised at trial.

### Count III – Breach of Note (Royalty Properties)

In order to state a claim for breach of contract, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of the subject contract by the defendant; and (4) that the defendant's breach resulted in damages. *Unterschuetz v. City of Chicago*, 346 Ill. App. 3d 65, 69 (1st Dist. 2004); *International Supply Co. v.*

---

[1] Mrs. Cannon was acquitted of the criminal trespass charges at bench trial.

*Campbell*, 391 Ill. App. 3d 439, 450 (2009). The Court finds that the Note is a valid and
enforceable contract . Mr. Terborg and Mr. Gudmundson testified that the Cannons executed the
Note on December 20, 2006, and while the Cannons refuse to confirm the authenticity of the
loan documents at issue in this case, they did confirm that their signatures were on the signature
page, and offered no compelling evidence to demonstrate that the note or any other documents
were inauthentic. Under the terms of the Third Modification of Loan Documents the Defendants
were to make monthly interest payments with the principal due on the Note's maturity date of
September 21, 2009. The Cannons admit that in May 2019, they ceased making monthly interest
payments and made no more payments toward the loan. To this date not a dime has been paid
towards the $14.5 million principal. Accordingly, Royalty Properties, LLC and Cannon Squire
Properties, LLC are in breach of the Note and Forest Preserve is entitled to recover
$27,858,248.45 consisting of principal, interest, late fees, property taxes, and property expenses.

### Count IV – Breach of Guaranties (Royalty Properties Note)

As with the Note, Mr. Gudmundson and Mr. Terborg testified that the Cannons executed
the Guaranty on December 20, 2006. The Cannons did not challenge the authenticity of the
Guaranty because the signature page contained language from the Guaranty. Under the terms of
the Guaranty the Cannons guaranteed payment due under the Note. Under the terms of the Third
Modification of Loan Documents the Defendants were to make monthly interest payments with
the principal due on the Note's maturity date of September 21, 2009. The Cannons admit that in
May 2019, they ceased making monthly interest payments and made no more payments toward
the loan. Accordingly, the Cannons are in breach of the Guaranty and the Forest Preserve is
entitled to recover $27,858,248.45 from the guarantors.

### Count V – Breach of Note (Merix)

Judgment was previously entered on Count V on August 30, 2013, and a release and
satisfaction of judgment was entered on May 5, 2015.

### Count VI – Breach of Guaranty (Merix Note)

Judgment was previously entered on Count VI on August 30, 2013, and a release and
satisfaction of judgment was entered on May 5, 2015.

### Defendants' Verified Amended Affirmative Defenses

### First Affirmative Defense – Truth In Lending Act ("TILA")

Summary Judgment was entered in favor of Forest Preserve against all Defendants as to
Defendants' First Affirmative Defense, except for Royalty Properties, LLC due to the automatic
bankruptcy stay. Upon consideration of the evidence, the Court finds that Royalty Properties,
LLC's TILA defense is unavailing.

The defense fails for numerous reasons. To begin, TILA does not apply to credit
transactions made primarily for agricultural purposes. 15 U.S.C.S. § 1603. "The term
'agricultural purposes' includes the production, harvest, exhibition, marketing, transportation,

13

processing, or manufacture of agricultural products by a natural person who cultivates, plants, propagates, or nurtures those agricultural products, including but not limited to the acquisition of farmland, real property with a farm residence, and personal property and services used primarily in farming." 15 U.S.C.S. § 1602(t). At the prior evidentiary hearing on Forest Preserve's motion to appoint a receiver or mortgagee in possession this Court determined, based on the evidence presented, that the property at issue in this case was a 400-acre horse farm with a large private residence, and that the Cannons purchased the property with the intent of making it their primary residence as well as raising and housing their 54 horses. Because the purpose of the transaction was to finance the purchase of a 400-acre farm, the primary purpose of the transaction was agricultural. This determination was only reinforced at trial where the Court was presented with further evidence that the Cannons intended to utilize the property in an agricultural manner, such as the letter sent to the McGinleys and the Merix Proposal. PX13 and 19, DX16 The fact that the farm includes a residence does not change this analysis. *Jonak v. John Hancock Mutual Life Insurance Co.*, 629 F. Supp. 90, 96 (D. Neb. 1985)("The clearest sign is the fact that the collateral for the loan was farmland and farm equipment. If the farmland includes a dwelling that does not defeat the agricultural nature of the transaction.").

Further, even assuming *arguendo* that the transaction at issue was not agricultural, the right of rescission created by 15 U.S.C.S. § 1635 applies only to consumer credit transactions. "The adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C.S. § 1602(i). Here credit was extended to Royalty Properties, LLC and Cannon Squire Properties, LLC, which are not natural persons. Further, C.F.R. pt. 226, Supp. I, § 226.3(a)(9) makes it clear that where credit is extended to an organization, such as an LLC, there can be no rescission, even if a natural person provides a guaranty or security. "The exemption for transactions in which the borrower is not a natural person applies, for example, to loans to corporations, partnerships, associations, churches, unions, and fraternal organizations. The exemption applies regardless of the purpose of the credit extension and regardless of the fact that a natural person may guarantee or provide security for the credit." *Id.*

Further still, even assuming *arguendo* that this was a consumer credit transaction with a residential purpose, the Cannons would still have no right to rescission since there is no right to rescission in a residential mortgage transaction. 15 USCS § 1635(e)(1).

### Second Affirmative Defense – Economic Duress

"Economic duress is a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances that deprive one of the exercise of one's own free will." *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 91, 707 N.E.2d 609, 614 (1st Dist. 1999). "To establish duress, one must demonstrate that the threat has left the individual 'bereft of the quality of mind essential to the making of a contract.'" *Alexander v. Standard Oil Co.*, 97 Ill. App. 3d 809, 815, 423 N.E.2d 578, 582 (5th Dist. 1981). Quoting *Kaplan v. Kaplan* (1962), 25 Ill. 2d 181, 186 N.E.2d 706, 709. "Where consent to an agreement is secured

merely because of hard bargaining positions or financial pressures, duress does not exist; a party must demonstrate inducement by a wrongful act or threat of another to execute an agreement under circumstances depriving him of the exercise of free will in order to invalidate an agreement on the basis of duress." *Wallenius v. Sison*, 243 Ill. App. 3d 495, 503, 611 N.E.2d 1096, 1101 (1st Dist. 1993). "The acts or threats complained of must be wrongful; however, the term 'wrongful' is not limited to acts that are criminal, tortious, or in violation of a contractual duty. They must extend to acts that are wrongful in a moral sense as well." *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 91, 707 N.E.2d 609, 614 (1st Dist. 1999).

It is the Defendants' contention that Amcore acted wrongfully by, not providing the loan documents until the morning of the closing, adding onerous terms to the loan documents at the loan presentation and not informing the Cannons of those new terms, denying the Cannons an adequate opportunity to review the loan documents, refusing to amend the loan documents at closing, and demanding that the Cannons assign their purchase agreement to a LLC.

The final set of loan documents did not exist until 2:40AM on the morning of the closing. Amcore did not even approve the loan until, the day prior to the closing. As this Court has held previously, it is not wrongful to fail to provide documents which do not exist. Further, Gudmundson sent marked drafts of the various loan documents to Zerman throughout the day prior to the closing. Because the Cannons attorney received the loan documents at the earliest possible time, Amcore's actions were not wrongful.

With regard to the additional terms added at the loan presentation, the Court finds nothing wrongful about their addition. The terms themselves are essentially additional security, they did not increase the interest rate or shorten the time the Defendants had to repay the loan. DX42 The Court finds nothing wrongful or unethical about the terms themselves. Given the short time frame the bank had to put together the loan, the large amount of money involved, and the speculative nature of the repayment sources, it was not unreasonable for Amcore to demand extra security. Further, Defendants' assertion that Amcore did not inform the Cannons of the new terms is belied by the evidence. Mrs. Cannon's contemporaneous notes indicate that after the loan committee meeting, the Cannons met with Terborg and Younger and discussed the additional terms. PX28.

As to the amount of time the Cannons had to review the documents, the Court cannot find that Amcore behaved wrongfully. The closing date was set by the McGinleys, not Amcore. The McGinleys refused to move the closing date because, there were severe tax implications if they failed to sell the Property by the end of the year. Further the McGinleys had another buyer for the property. Amcore cannot be blamed for the actions of the McGinleys. Nor can it be said that Amcore unreasonably delayed the loan process, since by all accounts this was an incredibly short time frame to put together this kind of a loan.

The Defendants' assertion that Amcore was unwilling to modify the loan documents is belied by the fact that Amcore executed the Addendum to Mortgage Loan Documents, which changed the attorneys' fees provision. Further, Amcore had no obligation to modify the terms it was offering.

As to the Defendants' assertion that Amcore wrongfully forced the Cannons to assign their purchase agreement to an LLC in order to make the agreement into a commercial transaction the Court finds that Amcore's actions were not wrongful. The Cannons testified at trial that it was their sole intention to build their dream home on the Property, that they did not contemplate forming an LLC, and never had a business intention for the property. While the Court accepts that Amcore insisted that the parties form an LLC, the Cannon's assertion that they never intended a business use for the property is not credible. The Merix Proposal and the letter the Cannons sent to the McGinley's both demonstrate the Cannons intended to make a business use of the Property, or at a minimum that the Cannons were willing to represent that they intended to make a business use of the property.

Undoubtedly, the Cannons were under financial pressure, but that is insufficient to establish duress. The Defendants have failed to demonstrate any wrongful threat or action on the part of Amcore that would constitute duress. Beggars cannot be choosers; Amcore was under no obligation to make any loan to the Defendants and was entitled to dictate the terms under which they would lend money. Further still, after the closing the Cannons invited the McGinleys and members of Amcore to a party at Hunt Ridge, even posing for pictures, hardly the conduct of persons who were bereft of their free will. PX75.

Finally, even if there were economic duress; "A victim of duress who accepts the benefits flowing from the contract for any considerable length of time ratifies the contract." *Carlile v. Snap-On Tools*, 271 Ill. App. 3d 833, 842, 648 N.E.2d 317, 324 (4th Dist. 1995); see also *Golden v. McDermott, Will & Emery*, 299 Ill. App. 3d 982, 993, 702 N.E.2d 581, 589 (1st Dist. 1998); *Bogue v. Franks*, 199 Ill. 411, 419, 65 N.E. 346, 349 (1902) ("Even if obtained by duress, a deed or mortgage is not, in general, void, but only voidable, and may be ratified, and can only be avoided by prompt action on the part of the injured party after the restraint has been removed, and cannot be avoided if ratified after the coercing influence has ceased to operate."). The Defendants retained the benefits of the mortgage agreement for several years before raising their economic duress defense. For the above reasons, Defendants Second Affirmative Defense fails.

## Third Affirmative Defense – Unclean Hands

"The doctrine of unclean hands applies if a party seeking equitable relief is guilty of misconduct, fraud, or bad faith toward the party against whom relief is sought and if that misconduct is connected with the transaction at issue in the litigation." *Zahl v. Krupa*, 365 Ill. App. 3d 653, 658, 850 N.E.2d 304, 309 (2nd Dist. 2006). The doctrine is not favored, *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 26, 975 N.E.2d 583; and its application is within the sound discretion of the trial courts. *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 84.

For the reasons outlined in this Court's consideration of Defendants' Second Affirmative Defense, the Court does not find that Amcore's actions were wrongful, and as such the doctrine of unclean hands does not bar Plaintiff's claims.

### Fourth Affirmative Defense – Estoppel

The Cannons assert that the Forest Preserve is equitably estopped from enforcing the loan documents because Amcore represented that it intended to provide longer term financing which it never did and because Amcore never intended to comply with the terms of the original Intercreditor Agreement, and instead substituted a new version while destroying the original version.

"To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313-14, 751 N.E.2d 1150, 1157 (2001).

First the Court will address the Defendants assertion that Amcore promised the Cannons they would refinance the loan to a longer term. The Court does not believe that Amcore misrepresented their intention to term out the loan to longer term financing or that at the time Amcore made those representations that they believed them to be false. Mr. Terborg and Mr. Younger both testified credibly that Amcore would be willing to term out the loan if there were significant payment made towards the principal. Further, the Amcore loan presentation states that one of the purposes of the 1 year interest only structure was to allow the Defendants to make "significant pay downs… with the idea of moving to a longer term financing arrangement…". DX42 Additionally, Amcore extended the maturity of the loan three times. It is not credible that Amcore would have included possibility of refinancing in the loan presentation, and extend the loan three times, if it had no intention of moving towards a longer-term financing arrangement. Accordingly, the Court cannot find that Amcore's representations that they were willing to re-finance the loan were false when they were made. Undoubtedly Amcore would have preferred to term out the loan if it were feasible, rather than foreclose on the Property which would be difficult to manage and sell.

As to the Cannons estoppel theory arising out the Inter Creditor Agreement, is unclear how the facts fit into an equitable estoppel theory, and this appears to be a jerry-rigged attempt to replead Defendants' previously plead defenses arising out the Inter Creditor Agreement. To begin with, the Court does not find the Cannon's version of events credible, and found Gudmundson's testimony that the parties were made aware before leaving the closing that the Inter Creditor Agreement was still being negotiated to be the most likely explanation of what happened. Particularly in light of the fact that the Cannons previously tried to use the Inter Creditor Agreement as a shield to avoid repaying the McGinleys and only raised this theory after that attempt failed. Further, the Forest Preserve is not seeking to enforce any of the Inter Creditor

Agreement's terms in these proceedings. Accordingly, Defendants Fourth Affirmative Defense fails.

### Fifth Affirmative Defense – Amcore has no Interest in the Loan

This defense is directed at Amcore, which is no longer a party to this action and indeed no longer exists.

### Sixth Affirmative Defense – Illusory Promise

This defense is directed towards the $1.3 million line of credit made to Merix and Counts V and VI, which are no longer at issue.

## Defendants' Verified Second Amended Counterclaims

### Count I – Breach of Implied Duty of Good Faith and Fair Dealing

"Every contract contains an implied covenant of good faith and fair dealing. "*Northern Trust Co. v. VIII South Michigan Associates*, 276 Ill. App. 3d 355, 367, 657 N.E.2d 1095, 1104 (1st Dist. 1995). "The obligation of good faith and fair dealing is a derivative principle of contract law and is essentially used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions. These implied covenants are generally implicated where one party to a contract is given broad discretion in performance." *Perez v. Citicorp Mortgage*, 301 Ill. App. 3d 413, 423-24, 703 N.E.2d 518, 525 (1st Dist. 1998)(internal citations omitted). "Generally, problems involving the duty of good faith and fair dealing arise where one party to a contract is given broad discretion in performance. The doctrine of good faith then requires the party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Citicorp Savings v. Rucker*, 295 Ill. App. 3d 801, 808, 692 N.E.2d 1319, 1324 (1st Dist. 1998). "Parties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith." *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 113, 618 N.E.2d 418, 424 (1st Dist. 1993).

Defendants have raised several issues arising from the execution of the loan documents, as well as the failure of Amcore to refinance or term out the loan. The duty of good faith and fair dealing is a contractual covenant and thus cannot be violated until a contract exists. As such, issues arising out of the formation and execution of the loan documents do not implicate the implied covenant of good faith and fair dealing. Likewise, the failure to refinance the loan does not implicate the implied duty of good faith and fair dealing as the loan documents themselves do not contain any duty to refinance the loan. "The covenant of good faith and fair dealing does not enable a guarantor to read an obligation into a contract that does not exist." *Bank One v. Roscetti*, 309 Ill. App. 3d 1048, 1060, 723 N.E.2d 755, 764 (4th Dist. 1999).

Finally, even if the implied covenant of good faith and fair dealing did apply, the Court (for the reasons outlined in the discussion of Defendants' Second Affirmative Defense) finds that Amcore did not act in bad faith. Accordingly, on Count I of Defendants' counterclaim the Court finds in favor of the Forest Preserve.

### Count II – Fair Debt Collection Act

Summary Judgment was granted in favor of the Forest Preserve on Count II, and the Fair Debt Collection Act was not raised at trial.

### Count III – Truth In lending Act

Summary Judgement was granted in favor of the Forest Preserve on Count III. After hearing the testimony at trial and considering the evidence, the Court finds no reason to alter its previous findings regarding the agricultural nature of the property and transaction, or its interpretation of the law regarding the Truth In Lending Act.

### Count IV – Breach of Contract (Interest Rate)

Summary Judgement was granted in favor of the Forest Preserve on Count IV, and the Court finds no reason to reconsider its decision on the matter.

### Count V – Rescission – Mutual Mistake

The Court previously denied Forest Preserves motion for summary judgment on Count V, because at the time the Court believed that Count V was seeking rescission of all of the loan documents. However, upon re-examination Count V only seeks rescission of the Merix loan and security agreement, and other documents to which Merix is a party. As discussed previously, claims arising out of the Merix line of credit were discharged by the release and satisfaction of judgment which was entered on May 5, 2015. Further, BMO Harris retained the Merix line of credit, as such the Forest Preserve is not the successor in interest to that loan. Accordingly, Judgment is entered in favor of the Forest Preserve as to Count V.

### Count VI – Fraudulent Inducement

"The elements of fraud in the inducement are: (i) a false representation of material fact, (ii) made with knowledge or belief of that representation's falsity, (iii) made with the purpose of inducing another party to act or to refrain from acting, and (iv) the other party reasonably relies upon the representation to its detriment." *Colagrossi v. Royal Bank of Scot.*, 2016 IL App (1st) 142216, ¶ 45, 57 N.E.3d 601. "To support an action for fraud, the alleged misrepresentation must be one of fact and not an expression of opinion." *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 387, 618 N.E.2d 459, 463 (1st Dist. 1993). "A false promise of future conduct with no current intent to fulfil that promise will [generally] not constitute fraud." *Id.* "A false promise of future conduct may constitute fraud if it is part of a fraudulent scheme. *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶¶ 33-34, 983 N.E.2d 1044.

As discussed in the Court's analysis of Defendants' equitable estoppel defense, the Court cannot find that Amcore misrepresented its willingness to refinance the loan had significant payments towards the principal been made. Further, the representations of Amcore would constitute a promise of future conduct, which is not grounds for fraud absent evidence of a fraudulent scheme, and Defendants have not put forth evidence of a fraudulent scheme.

### Fraud In The Factum

The Cannons claim that because the loan documents contained terms which they state that they were unaware of, there was fraud in the factum and the loan documents are void in their entirety. There is little to no case law in Illinois regarding fraud in the factum. The US Supreme Court has cited favorably to the commentary on U.C.C. § 3-305 regarding fraud in the factum. *Langley v. FDIC*, 484 U.S. 86, 93 (1987).

"Subsection (a)(1)(iii) refers to "real" or "essential" fraud, sometimes called fraud in the essence or fraud in the factum, as effective against a holder in due course. The common illustration is that of the maker who is tricked into signing a note in the belief that it is merely a receipt or some other document. The theory of the defense is that the signature on the instrument is ineffective because the signer did not intend to sign such an instrument at all. Under this provision the defense extends to an instrument signed with knowledge that it is a negotiable instrument, but without knowledge of its essential terms. The test of the defense is that of excusable ignorance of the contents of the writing signed. The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge. In determining what is a reasonable opportunity all relevant factors are to be taken into account, including the intelligence, education, business experience, and ability to read or understand English of the signer. Also relevant is the nature of the representations that were made, whether the signer had good reason to rely on the representations or to have confidence in the person making them, the presence or absence of any third person who might read or explain the instrument to the signer, or any other possibility of obtaining independent information, and the apparent necessity, or lack of it, for acting without delay. Unless the misrepresentation meets this test, the defense is cut off by a holder in due course."

U.C.C. § 3-305, Official Comment 1.

The Cannons cannot be said to have been unaware of the nature of the documents they were signing *i.e.* loan and mortgage documents. However, the Cannons claim to have been ignorant of several of the terms of the loan documents (particularly those added at the loan presentation), and to have had no reasonable time to review the documents. As discussed previously, the Cannons' assertion that they were ignorant of the loan's terms is belied by several things. First, Mrs. Cannons contemporaneous notes clearly indicate that the Cannons met with Mr. Terborg and Mr. Younger in December 20, 2006 where they discussed the terms added by the loan committee. Further, the Cannons were represented by Mr. Zerman, who received draft loan documents periodically throughout the day on December 20, 2006, and whose firm signed a letter indicating that they had reviewed all the loan documents. Additionally, Mr. Gudmundson testified that the final loan documents contained perhaps only 20 marked pages with changes. While the Cannons may not have an opportunity to read every single page of the final loan documents, the Court finds that they had sufficient opportunity to familiarize themselves with the essential terms. Accordingly, there is no fraud in the factum.

### Count V (sic) – Intercreditor Agreement

Summary Judgment was granted in favor of the Forest Preserve on Count V, and the Court finds no reason to reconsider its decision on the matter. However, issues surrounding the Inter Creditor Agreement arose at trial, and a few things should be made clear. The Court found Gudmundson and Wilson's testimony regarding the Inter Creditor Agreement to be credible, and believes that the Cannons were made aware of the fact that the Inter Creditor Agreement was not final and still being negotiated when they signed version 1. Further, at trial Defendants put forth an argument that the Intercreditor Agreement somehow moved Merix from the first junior lien position behind Amcore to a second junior lien position behind Horizon Farms, Inc. The Court was unable to find anything in the loan documents which gave Merix a lien on the Property, and nothing in the Intercreditor Agreement.

### Count VI (sic) – Failure to Preserve and Maintain Improvements

Leave to file Count VI (sic) was denied on October 18, 2018.

### Count VII (sic) – Unconstitutional Takings

Leave to file Count VII (sic) was denied on October 18, 2018.

### Plaintiff's Affirmative Defenses to Defendants' Second Amended Counterclaims

### First Affirmative Defense – Waiver

"Waiver is the relinquishment of a known right. A waiver may be made by express agreement or implied from the conduct of the party who allegedly waived the right. Waiver will be implied when a party's conduct is inconsistent with an intention to assert the right." *Gray v. Mundelein College*, 296 Ill. App. 3d 795, 809, 695 N.E.2d 1379, 1389 (1st Dist. 1998). The Cannons never presented any evidence that they ever complained about the alleged duress they suffered at the closing. By accepting the benefits of the loan for several years without complaint, the Defendants waived their economic duress defense.

Additionally, the loan documents and extensions contain various express waivers which the Cannons executed. The Loan Documents contained provisions waiving the right to a jury trial. Further, the Secured Guaranty of Payment contains a provision in which the Cannons as Guarantors waive "every present and future defense (other than the defense of payment in full), cause of action, counterclaim or setoff" that they or the borrowers may have to Amcore's enforcement of the Guaranty or Loan Documents. DX60. The First and Second Modifications reaffirmed the Guaranty and Loan Documents. DX109 DX117. The Third Modification of Loan Documents also reaffirmed the Guaranty, and contained language indicating the Defendants were not aware of any claims, counterclaims, defenses, or set-offs, except for their 360/365 interest rate dispute. By re-affirming the Loan Documents twice and the Guaranty three times, the Cannons waived any defenses as to the validity of the Loan Documents and Guaranty.

### Second Affirmative - Defense Estoppel

The Forest Preserve contends that because the Cannons accepted the benefits of the loan for several years without complaining of any inconsistencies (with the exception of the interest

rate calculation), they should be estopped from asserting them now. The Court does not agree
that Defendants are estopped from raising inconsistencies with the loan documents on that basis.

## Third Affirmative Defense – Impossibility

The Forest Preserve argues that the Court should not grant the Defendants request for
rescission, due to the impossibility of returning the parties to their pre-contract positions.
"Rescission is an equitable remedy that seeks to restore contracting parties to their precontract
positions. When a contract is rescinded, it is as if the contract never existed in the first place. A
trial court's decision granting or denying a request to rescind a contract is within the
sound discretion of the court, whose ruling will not be disturbed absent an abuse of
that discretion." *YPI 180 N. LaSalle Owner, Ltd. liability Co. v. 180 N. LaSalle II, Ltd. liability
Co.*, 403 Ill. App. 3d 1, 5, 933 N.E.2d 860, 863-64 (1st Dist. 2010) (internal quotations omitted).
Given the passage of time it would be extremely difficult if not impossible to restore the parties
to their pre contract positions. Even if the Court were inclined to rule in favor of the Defendants
on their claims, we would not rescind the parties' agreement.

## Fourth Affirmative Defense - Statute of Frauds

The Forest Preserve asserts that Defendants are seeking to enforce terms set forth in pre-
loan oral discussions, which implicates the statute of frauds because those terms could not be
performed within one year. The Forest Preserve has not made it clear what terms it is referring
to, and as such the defense is ineffective.

## Fifth Affirmative Defense – Laches

"*Laches* is an equitable doctrine which precludes the assertion of a claim by a litigant
whose unreasonable delay in raising that claim has prejudiced the opposing party. The doctrine is
grounded in the equitable notion that courts are reluctant to come to the aid of a party who has
knowingly slept on his rights to the detriment of the opposing party. Two elements are necessary
to a finding of *laches*: (1) lack of diligence by the party asserting the claim and (2) prejudice to
the opposing party resulting from the delay." *Tully v. State*, 143 Ill. 2d 425, 432, 574 N.E.2d 659,
662 (1991)(internal citations omitted). "[T]raditionally, statutes of limitation were generally
applied to legal actions and the *laches* doctrine was applied to those actions based in equity, such
"mechanical" applications are no longer followed **(Check the quotation)**. have applied *laches* to
"equity-like" actions, such as *mandamus*, to quasi-equitable suits, to actions
where equitable considerations are at the heart of a claim actually based in law, as well as to
purely legal claims." *Bill v. Board of Education*, 351 Ill. App. 3d 47, 56, 812 N.E.2d 604, 612
(1st Dist. 2004) (internal citations omitted).

The Court finds that the Defendants counterclaims and defenses were raised with
sufficient diligence that the doctrine of laches would not apply.

## Sixth Affirmative Defense - Statute of Limitations

This defense applies to Defendants TILA and Fair Debt Collection Act claims, which
were disposed of on summary judgment.

### Seventh Affirmative Defense - Bad Faith/Unclean Hands

The Forest Preserve asserts that Defendants improperly threatened Amcore and BMO Harris with litigation when they held the note in an attempt to delay resolution of the matter, and further that Defendants mislead Amcore as to their ability to repay the loan, and negotiated in bad faith. There were no threats of litigation to Amcore or BMO Harris discussed at trial.

Despite the Cannons' assertion at trial that they only intended to make the Property their personal residence and had no business intention, they undoubtedly represented to Amcore and others that they intended to use the Property for Merix's business and as a premier thoroughbred training facility. The Merix Proposal alone outlines several businesses uses of the Property. Yet, there is no evidence that the Cannons ever even attempted to use the property for any of Merix's business, nor that they took steps to create the kind of thoroughbred operation described in the Merix Proposal and letter to the McGinleys. Indeed, the Cannons actively canceled leases they had for the Property, and represented to a newspaper reporter after the closing that they intended to make the farm private. In light of the inconsistencies between the Cannons' purported intentions and their actions, it is not unreasonable to conclude that the Cannons made these representations regarding their intended business usage of the Property without any intention of actually using the Property in that way. However, because the Court is uncertain as to what the Cannon's actually intended, the Court declines to assert the doctrine of unclean hands.

### Eight Affirmative Defense - Equitable Lien

"The imposition of an equitable lien is a remedy for a debt that cannot be legally enforced, but which ought in right and fairness to be recognized." *CitiMortgage, Inc. v. Parille*, 2016 IL App (2d) 150286, ¶ 33, 49 N.E.3d 869. "The essential elements of all equitable liens are (1) a debt, duty or obligation owing by one person to another and (2) a *res* to which that obligation fastens." *Hargrove v. Gerill Corp.*, 124 Ill. App. 3d 924, 931, 464 N.E.2d 1226, 1231 (2nd Dist. 1984). The Defendants received $14.5 million from Amcore to finance the purchase of the Property with the expectation that they would have to repay the $14.5 million plus interest. The Forest Preserve is the successor in interest to the debt owed to Amcore. Thus, there is an obligation and a *res* to which it fastens. Accordingly, if for whatever reason, the mortgage and note are found to be unenforceable, an equitable lien would be appropriate.

### Conclusion

Despite the lengthiness of this Order, the number of claims, counterclaims, and defenses involved; as well as the numerous other lawsuits arising out of the underlying transaction, this is a rather simple case. In 2006, the Cannons, through Royalty Properties, borrowed $14.5 million to finance the purchase of the 400-acre horse farm that is the subject of this action. To this day the Cannons have not re-paid so much as a cent of that $14.5 million. Despite the Cannons' contention that Amcore misrepresented the terms of the agreement, it was the impression of the Court that the Cannons were willing to do and say anything in order to obtain the Property, and the Cannons are still willing to do or so anything to keep the Property (except pay for it). As such, the Court did not find the Cannons' testimony to be worthy of the Court's trust or belief.. It was the Court's impression that everyone involved in the transaction bent over backwards to assist the Cannons in obtaining the Property. Amcore worked diligently to prepare the loan in

time to meet the closing deadline. Mr. Gudmundson labored well into the early hours of the morning drafting the loan documents. And the McGinleys, who could have easily taken the Cannons $2 million earnest money deposit and sold the property to their other buyer, instead chose to loan the Cannons $1.5 million when they were short the money to close. The Cannons repaid that kindness with over a decade of litigation.

As such, judgment is entered in Favor of the Forest Preserve. Additionally, by the attached order, Judgment for Foreclosure and Sale is granted in favor of the Forest Preserve.

Wherefore, it is hereby

ORDERED:

1. The Plaintiff's Motion to Strike Defendants' Proposed Findings of Facts and Conclusions of law is denied as moot and the presentment date of June 25, 2019 is stricken.

2. Judgment of Foreclosure and Sale is entered.

Entered: _____

Judge Margaret Ann Brennan          1846
Circuit Court of Cook County, Illinois
County Department, Law Division

Judge Margaret A. Brennan

JUN 21 2019

Circuit Court - 1846

# EXHIBIT 3

1         IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3

4 ROYALTY PROPERTIES, LLC,     ) No. 19 B 07692
                     )
5                      ) Chicago, Illinois
                     ) May 15, 2019
6           Debtor.     ) 11:00 a.m./2:00 p.m.

7

8           VOLUME II - EXCERPT "A"

9         TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE JACQUELINE P. COX
10

11
  APPEARANCES:
12

13
For the Debtor/Debtor
14 in Possession:      Mr. John H. Redfield;

15
For the Secured
16 Creditor Forest
Preserve District of
17 Cook County:      Mr. Christopher W. Carmichael;
                  Mr. Victor P. Henderson.
18

19

20

21

22
  Court Reporter:     MARY C. KELLY, CSR
23                   United States Courthouse
                  219 South Dearborn Street
24                   Room 661
                  Chicago, Illinois  60604
25

1    (Proceedings were had which are not transcribed.)

2                 *  *  *  *  *  *  *  *  *  *  *  *  *

3                 THE COURT:  Any other witnesses?

4                 MR. CARMICHAEL:  I don't believe there

5    are any, Judge.  There's none here.

6                 MR. REDFIELD:  Oh, well, we have Ms.

7    Squires-Cannon.

8                 THE COURT:  Go right ahead.

9                 MR. CARMICHAEL:  I believe she testified

10   already, Judge.

11                MR. REDFIELD:  Well, you called her as

12   an adverse witness.  I haven't called her as our

13   witness.

14                MR. CARMICHAEL:  I believe he questioned

15   her, Judge.

16                THE COURT:  I'm sorry?

17                MR. CARMICHAEL:  I believe he questioned

18   her for a substantial period of time.

19                THE COURT:  Let's make sure we -- let's

20   just make sure it's not duplicative.

21                Let's proceed.

22     MERYL SQUIRES-CANNON, WITNESS, PREVIOUSLY DULY

23                           SWORN,

24                    DIRECT EXAMINATION

25   BY MR. REDFIELD:

1    and drop the seeds in at the required distance on

2    center.

3            So there are different varietals of --

4    many different varietals of hemp, and some of them

5    go to flower in August, September, and are

6    harvested in late September, early October.

7            There are other varietals I mentioned

8    called auto flower, and they are faster growing.

9    They are short, squat little plants about 3 to

10   4 feet tall, and they flower early, and they are

11   ready to be harvested in August.

12           So my plan is to capture the early

13   market of CBD buyers and be able to grow early

14   flowering hemp and also grow the other kind for the

15   later season.

16       Q.    Well, it's May now, the middle of May.

17   When do you have to plant for -- to get a crop this

18   season?

19       A.    First week of June is fine.

20       Q.    What's the latest you could plant?

21       A.    June 15.

22       Q.    So you have to -- we have to -- you have

23   to get plants -- the seeds in the ground basically

24   by that date, is that correct?

25       A.    Correct.

1      Q.      And then that will give you enough

2   time -- those will harvest when?

3      A.      Well, if we choose like the oxo

4   (phonetic) varietal, then they will be harvested

5   late September, early October.  But if we use the

6   auto pilot, it's one of the auto flowering, it will

7   be harvested in August.

8      Q.      You weren't here this morning, is that

9   correct?

10      A.      Correct.

11      Q.      And where were you this morning?

12      A.      I met with a group of hemp purchasers

13   who will buy the crop.  They only purchase crop.

14   They flew in from Colorado to meet with me.  So I

15   met with them on the farm and took them on a tour.

16   It was a very successful meeting.

17      Q.      And so that's in addition to the

18   memorandum of understanding?  This is a new group

19   of --

20      A.      This is a different group.

21      Q.      And this new group would be your

22   preferred group to go with?

23      A.      It is.  It certainly is now.

24      Q.      I'm sure Mr. Carmichael would like to

25   know the name of that group.

1          A.     That's the plan, yes.

2          Q.     Okay.  Because you know based on the

3    schedule that you put together, that you owe

4    approximately $6 million to the Forest Preserve and

5    to the McGinleys combined, right?  Because these

6    are your notes.  4.2 million to the first secured

7    creditor, and 1.8 million to the second secured

8    creditor.  So that's about $6 million, right?

9          A.     I'm assuming you're correct.

10         Q.     Well --

11         A.     No, that's all right.

12         Q.     This is your schedule.

13         A.     I have it in front of me.

14         Q.     Okay.  So look at the line items because

15   you didn't go over those line items.

16         A.     Yes.

17         Q.     The point is that you're asking the

18   court to give you more time so you can pay

19   $6 million in the next few months to these two

20   creditors, right?

21         A.     Yes.

22         Q.     Now, on this schedule, I want to talk

23   about some of the numbers that you didn't talk

24   about.

25                You project that you're going to make

1     Q.    And applying for licenses in this 21st

2  century, that's generally done online, is that

3  correct?

4     A.    Pretty much everything is done online,

5  yes.

6              MR. REDFIELD:  No further questions.

7              THE COURT:  Any other questions of this

8  witness?

9              MR. HENDERSON:  No, Your Honor.

10              THE COURT:  No other questions.

11              Thank you for testifying.

12              THE WITNESS:  Thank you, Your Honor.

13           *  *  *  *  *  *  *  *  *  *  *  *  *

14      (Further proceedings had not transcribed.)

15

16              (Which were the excerpt of proceedings

17               had in the above-entitled cause,

18               May 15, 2019, 11:00 a.m./2:00 p.m.)

19

20  I, MARY C. KELLY, CSR, DO HEREBY CERTIFY THAT THE
   FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
   EXCERPT OF PROCEEDINGS HAD IN THE ABOVE-ENTITLED

21  CAUSE.(f)

22

23

24

25